In re INSURANCE BROKERAGE
ANTITRUST LITIGATION
(MDL No. 1663)

Shapiro & Lodwick Co. LPA, Sports &
Spine Physical Therapy Inc., Irene Pe-
koe, Hoffman Legal Group, LLC,
Lacy Redd and Cross & Sir, Objectors,
Appellants, No. 07–1759

Romero General Construction Cor-
poration, Objector, Appellant,
No. 07–1763

Dan C.D. Sturdevant, Objector,
Appellant, No. 07–1769

Van Enterprises, Inc., Objector,
Appellant, No. 07–1779

Class Members Iaad O Inc., Trustee of
8 Pacific Street Trust and Zorkess
LLC, Appellants, No. 07–1786

Emerald Financial Group, Inc.,
Objector, Appellant, No.
07–1793

Palomar Grading and Paving,
Inc., Objector, Appellant,
No. 07–1796

Harold Folsom Jensen, Objector,
Appellant, No. 07–1826

Van Enterprises, Inc., Objector,
Appellant, No. 07–2935

Class Members Iaad O Inc., Trustee of
8 Pacific Street Trust and Zorkess
LLC, Appellants, No. 07–2957

Shapiro & Lodwick Co. LPA, and
Sports & Spine Physical Therapy,
Inc., Appellants, No. 07–3037

Lacy Redd and Cross & Sir,
Appellants, No. 07–3038

Irene Pekoe and Hoffman Legal
Group, LLC, Appellants,
No. 07–3039

Romero General Construction Corp.,
Appellant, No. 07–3040

Emerald Financial Group, Inc., Palomar
Grading and Paving, Inc., and Harold
Folsom Jensen, Appellants, No. 07–
3041

Dan C.D. Sturdevant, Appellant,
No. 07–3042

Van Enterprises, Inc., Appellant,
No. 07–3687.

Nos. 07–1759, 07–1763, 07–1769, 07–1779,
07–1786, 07–1793, 07–1796, 07–1826, 07–
2935, 07–2957, 07–3037, 07–3038, 07–
3039, 07–3040, 07–3041, 07–3042, 07–
3687.

United States Court of Appeals,
Third Circuit.

Argued April 21, 2009.

Filed: Sept. 8, 2009.

 ☞56.1

Edward F. Siegel, Cleveland, OH, Attorney for Appellants, Shapiro & Lodwick Co., Sports & Spine Physical Therapy Inc., Irene Pekoe, Hoffman Legal Group, Lacy Redd and Cross & Sir.

Edward W. Cochran, Cochran & Cochran, Shaker Heights, OH, Attorney for Appellants, Irene Pekoe and Hoffman Legal Group.

N. Albert Bacharach, Gainsville, FL, Attorney for Appellants, Lacy Redd and Cross & Sir.

Andrea J. Lawrence, Cohen, Tauber, Spievack & Wagner LLP, New York, NY, Attorney for Appellants, Romero General Construction Corp., Emerald Financial Group, Inc., Palomar Grading and Paving, Inc. and Harold Folsom Jensen.

Kenneth E. Nelson, Nelson Law Firm, PC, Kansas City, MO, Stephen Tsai, Bridgewater, NJ, Attorneys for Appellant, Dan C.D. Sturdevant.

Howard J. Bashman, Esq., (Argued), Law Offices of Howard J. Bashman, Willow Grove, PA, D. Gibson Gibson, McClure, Wallace & Daniels, LLP, Dallas, TX, Ethan L. Shaw, Moore Landrey LLP, Austin, TX, Alani Golanski, Weitz & Luxenberg, New York, NY, Attorneys for Appellant, Van Enterprises, Inc.

John J. Pentz, III (Argued), Class Action Fairness Group, Maynard, MA, Edward F. Siegel, Cleveland, OH, Attorneys for Appellants, Class Members Iaad O, Inc., Trustee of 8 Pacific Street Trust and Zorkess LLC.

Bryan L. Clobes (Argued), Ellen Meriwether, Cafferty Faucher LLP, Philadelphia, PA, Edith M. Kallas, Joe R. Whatley, Jr., Whatley, Drake & Kallas LLC, New York, NY, Attorneys for Appellees, Opticare Health System, Sunburst Hospitality, Golden Gate Bridge Highway and Transportation District, Redwood Oil Co., Bayou Steel Corp., Clear Lam Packaging, Inc., Cellect LLC, City of Stamford, Connecticut Spring & Stamp Co., Eagle Creek, Inc., Comcar Industries, Inc., Gateway Club Apartments, Ltd., Michigan Multi-King Corp., Robert Mulcahy, Glenn Singer, Enclave, LLC, Omni Group of Companies and Class Plaintiffs.

Ann M. Ashton, Ralph C. Ferrara, Elizabeth B. Sandza, Dewey & LeBoeuf, LLP, Washington, DC, Jonathan E. Richman, Dewey & LeBoeuf, LLP, New York, NY, Attorneys for Appellees, Zurich American Ins. Co., d/b/a Zurich NA, American Guarantee and Liability Ins. Co., Assurance Company of America, Empire Fire and Marine Ins. Co., Empire Indemnity Ins. Co., Fidelity and Deposit Company of Maryland, Steadfast Ins. Co. and Zurich Financial Services.

James A. Donahue, III (Argued), Jennifer J. Kirk, Office of Attorney General of Pennsylvania Harrisburg, PA, Attorney for Appellees, Commonwealth of Pennsylvania, Commonwealth of Virginia, State of Florida, State of California, State of Hawaii, State of Maryland, Commonwealth of Massachusetts, State of Texas and State of Oregon.

Christopher R. Hunt, Office of the Attorney General of Florida Department of Legal Affairs, Tallahassee, FL, Attorney for Appellee, State of Florida.

Kathleen Foote, Office of the Attorney General of California, San Francisco, CA, Attorney for Appellee, State of California.

Rodney Kimura, Office of the Attorney General of Hawaii, Honolulu, HI, Attorney for Appellee, State of Hawaii.

Alan M. Barr, Office of Attorney General of Maryland, Baltimore, MA, Attorney for Appellee, State of Maryland.

Amy L. Nable, Office of Attorney General of Massachusetts, Boston, MA, Attorney for Appellee, Commonwealth of Massachusetts.

Mark Toby, Bret Fulkerson Office of the Attorney General of Texas, Austin, TX, Attorney for Appellee, State of Texas.

Jennifer L. Gobble, Office of the Attorney General of Virginia, Richmond, VA, Attorney for Appellee, Commonwealth of Virginia and Attorney General of Virginia.

Tim Nord, Caren Rovics, Office of the Attorney General of Oregon, Salem, OR, Attorney for Appellee, State of Oregon.

Edwin M. Larkin, III (Argued), Lina M. Viviano, Christopher J. Paolella, Winston & Strawn, New York, NY, Terrence M. Grimm, Winston & Strawn, Chicago, IL, James S. Richter, Winston & Strawn, Newark, NJ, Attorneys for Appellees, Arthur J. Gallagher & Co., Arthur J. Galla-

gher Risk Management Services, Inc. and Gallagher Benefit Services, Inc.

Before: SCIRICA, Chief Judge, FISHER and GREENBERG, Circuit Judges.

OPINION OF THE COURT

FISHER, Circuit Judge.

At issue in this consolidated appeal are the standards a district court applies when deciding whether to certify a settlement-only class, approve a class settlement, and approve class counsel's petition for attorneys' fees. More specifically, we are presented with challenges to the District Court's orders granting final approval of a $121,800,000 settlement and a $28,000,000 settlement, as well as to the District Court's order approving an award of $29,500,000 for attorneys' fees and expenses in conjunction with the larger of the two settlements. Appellants are members of the settlement class in one or both of the settlements who objected to various aspects of the settlement agreements prior to the District Court granting final approval of those agreements. Appellees are the settling parties, consisting of the plaintiffs, settling defendants, and intervenor attorneys general in one settlement, and the plaintiffs and settling defendants in the other settlement. Because we conclude that the class certification requirements of Federal Rule of Civil Procedure 23(a) and (b) were satisfied with respect to both settlement classes and that both settlements were fair under Federal Rule of Civil Procedure 23(e), we will affirm the District Court's orders granting final approval of both settlements. We will also affirm the District Court's order granting attorneys' fees because we conclude that

the District Court acted within its discretion in awarding a reasonable fee.

## I. Background

The origins of this case date back to October 2004 when the New York State Attorney General, Eliot Spitzer, filed a civil complaint against the insurance broker Marsh & McLennan (Marsh) in New York state court, alleging that Marsh had solicited fixed bids from insurance companies and had then received improper payments for directing customers to those companies. In November 2004, a multistate group consisting of twelve attorneys general and several state insurance departments began investigating the alleged bid rigging and steering activities of brokers and insurers in the property and casualty insurance industry. Private parties commenced numerous putative class actions in federal courts across the country as well.

On February 17, 2005, the Judicial Panel on Multidistrict Litigation consolidated these private civil actions from multiple jurisdictions under 28 U.S.C. § 1407 and transferred the cases to the United States District Court for the District of New Jersey for pretrial proceedings.[1] *In re Ins. Brokerage Antitrust Litig.*, 360 F.Supp.2d 1371 (2005). The plaintiffs claimed a vast conspiracy between some of the nation's largest insurance brokers (the Broker Defendants) and insurance carriers (the Insurer Defendants) involving bid rigging and allocating or steering customers to defeat competition in the insurance market in exchange for high brokerage commissions. The District Court initially severed the various actions and realigned them into two consolidated dockets—one consolidated case pertaining to property and casualty commercial insurance (the Commercial

---

1. Judge Faith S. Hochberg initially presided over the consolidated cases; however, Chief

Judge Garrett E. Brown, Jr. replaced her on January 3, 2007, due to her recusal.

Case) and the other consolidated case pertaining to employee benefits insurance (the Employee Benefits Case). *See In re Ins. Brokerage Antitrust Litig.,* 2006 WL 2850607, at *2 (D.N.J. Oct.3, 2006).

The plaintiffs in the Commercial Case are a proposed class of businesses, individuals, and public entities who, between August 26, 1994 and September 1, 2005, engaged the services of the Broker Defendants to obtain advice with respect to the procurement or renewal of commercial property and casualty insurance and entered into or renewed an insurance policy with the Insurer Defendants. The plaintiffs in the Employee Benefits Case are both employers who utilized the services of the Broker Defendants to obtain group insurance coverage from the Insurer Defendants for their employees as part of their employee benefits plans and employees who obtained insurance from the Insurer Defendants through their employers' benefits plans.

In August 2005, the plaintiffs filed separate consolidated amended complaints in the Commercial Case and in the Employee Benefits Case. The plaintiffs in the Commercial Case alleged that "[t]he Broker Defendants and Insurer Defendants engaged in a combination and conspiracy to suppress and eliminate competition in the sale of insurance by coordinating and rigging bids for insurance policies, allocating insurance markets and customers and raising, maintaining or stabilizing premium prices above competitive levels." (Corrected First Consolidated Am. Commercial Class Action Compl. ¶ 1.) The plaintiffs in the Employee Benefits case alleged that the Broker Defendants and Insurer Defendants

"have conspired to manipulate the insurance market through undisclosed profit-sharing agreements and kickbacks in an effort to capture larger market shares and profits to the detriment of their unwitting clients and insureds. Although the Broker Defendants are hired to find the best insurance coverage at the lowest price, the Insurer Defendants pay the Broker Defendants undisclosed or inadequately disclosed Contingent Commissions, Communication Fees, and other compensation so that the Broker Defendants will steer their clients to them."

(Corrected First Consolidated Am. Employee Benefits Class Action Compl. ¶ 1.)

The plaintiffs in both the Commercial Case and the Employee Benefits Case brought claims against the Broker and Insurer Defendants for violating the Sherman Act, 15 U.S.C. § 1, the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c)(d), the antitrust laws of forty-eight states and the District of Columbia, and state common law duties (i.e., unjust enrichment and breach of fiduciary duty).[2] The plaintiffs in both cases sought restitution, compensatory, punitive and treble damages, disgorgement, injunctive and declaratory relief, and attorneys' fees and costs.

After the plaintiffs filed their first amended complaints, the defendants filed motions to dismiss the federal claims in both cases pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that the facts alleged in the complaints were insufficient to state a cause of action for a Sherman Act or RICO violation. Almost a year later, on October 3, 2006, the District Court granted the defendants' motions to dismiss for failure to state a cause of ac-

---

**2.** Additionally, the employee-plaintiffs in the Employee Benefits Case asserted claims against the Insurer Defendants for breach of fiduciary duty under the Employee Retirement Income Security Act of 1974 (ERISA), Section 502(a)(2), 29 U.S.C. § 1132(a)(2).

tion as to the Sherman Act and RICO claims, but did so without prejudice and gave leave to the plaintiffs to amend their pleadings. *In re Ins. Brokerage Antitrust Litig.*, 2006 WL 2850607 (D.N.J. Oct.3, 2006). Subsequently, the plaintiffs filed a supplemental statement of particularity in each case for their federal antitrust claims and an amended case statement for their RICO claims. The defendants renewed their motions to dismiss these claims pursuant to Rule 12(b)(6). On April 5, 2007, the District Court once again granted the defendants' motions to dismiss these claims, without prejudice, and gave the plaintiffs leave to amend their pleadings. *In re Ins. Brokerage Antitrust Litig.*, 2007 WL 1062980 (D.N.J. Apr.5, 2007). Not long thereafter, the plaintiffs filed a Second Amended Complaint in the Commercial Case and Employee Benefits Case, and the defendants again renewed their motions to dismiss the federal claims. On August 31, 2007 and September 28, 2007, the District Court dismissed the Sherman Act claims and RICO claims in both cases on Rule 12(b)(6) grounds and, this time, did so with prejudice. *In re Ins. Brokerage Antitrust Litig.*, 2007 WL 2533989 (D.N.J. Aug.31, 2007); *In re Ins. Brokerage Antitrust Litig.*, 2007 WL 2892700 (D.N.J. Sept.28, 2007).

### A. The Zurich Settlement

In August 2005, the Zurich Defendants were added to the Commercial Case putative class action.[3] At the same time as the litigation was proceeding, the Zurich Defendants were also the subject of investigations conducted by various state attorneys general and state departments of insurance stemming from the same alleged practices in the marketing and sale of commercial insurance. On October 14, 2005, the Zurich Defendants and the plaintiffs entered into a Memorandum of Understanding (MOU), which set forth the principal terms of a settlement of the claims against the Zurich Defendants. Specifically, the MOU established that any claims arising out of transactions with the Zurich Defendants from August 26, 1994 through September 1, 2005 would be resolved by the settlement and that, in return, the Zurich Defendants would establish a $100,000,000 settlement fund for the benefit of the Settlement Class. The Settlement Class included

> "all individuals or entities, who during the Settlement Class Period, engaged the services of (i) one of the Broker Defendants or any subsidiary or affiliate of a Broker Defendant in connection with a Settlement Class Policy Purchase from any Zurich Insurer, any Insurer Defendant or any insurance company that is not an affiliate or subsidiary of a Zurich Insurer, or (ii) any other broker . . . in connection with a Settlement Class Policy Purchase from any Zurich Insurer."

The MOU was subject to the completion of full confirmatory discovery and the plaintiffs reserved the right to terminate the MOU if, following completion of the confirmatory discovery, they reasonably and in good faith did not believe the terms of the settlement were fair, reasonable, and adequate. The MOU was also contingent upon the successful resolution of the ongoing state investigations and the successful negotiation and execution of a stip-

---

**3.** The Zurich Defendants are a group of insurers comprised of Zurich Financial Services, Zurich American Insurance Company, Steadfast Insurance Company, Fidelity and Deposit Company of Maryland, Empire Fire and Marine Insurance Company, American Guarantee and Liability Insurance Company, Empire Indemnity Insurance Company, and Assurance Company of America.

ulation of settlement between the Zurich Defendants and the plaintiffs.

On March 20, 2006, the Zurich Defendants reached an agreement (Multi–State Agreement) with ten states—California, Florida, Hawaii, Maryland, Massachusetts, Oregon, Pennsylvania, Texas, Virginia, and West Virginia—which resolved the investigations of the attorneys general in those states against the Zurich Defendants. At the same time, the Zurich Defendants reached a Regulatory Settlement Agreement with fifteen state departments of insurance, which contained provisions that mirrored those contained in the Multi–State Agreement and resolved the investigations of the insurance departments in those various states against the Zurich Defendants.[4] Under the terms of the Multi–State Agreement, the Zurich Defendants agreed to provide $51,700,000 in restitution to the Settlement Class, which would supplement the settlement relief to be provided pursuant to any final settlement agreement reached by the parties and would be distributed to the Settlement Class in accordance with the plan of allocation set forth in such a settlement agreement.[5]

On March 27, 2006, the Zurich Defendants executed a separate agreement with the attorneys general in the states of New York, Connecticut, and Illinois (Three–State Agreement), which resolved the investigations against the Zurich Defendants in those states. The Three–State Agreement required the Zurich Defendants to establish an $88,000,000 settlement fund to provide relief to a group of policyholders specified in the Three–State Agreement. Any distributions made pursuant to the Three–State Agreement were to be separate from those made pursuant to any final settlement agreement reached by the parties and the Multi–State Agreement.

On July 26, 2006, following the resolution of the state investigations, the Zurich Defendants entered into a Stipulation of Settlement with the plaintiffs (Zurich Settlement Agreement). The terms of the Zurich Settlement Agreement provided that the Zurich Defendants would pay $100,000,000 to the policyholders who meet the definition of the Settlement Class; however, because some of the potential Settlement Class Members were also eligible to seek relief under the separate Three–State Agreement, the Zurich Settlement Agreement allowed the Zurich Defendants to initially create a fund in the

**4.** It is unclear from the record which states participated in the Regulatory Settlement Agreement.

**5.** The value of private class action lawsuits occurring concurrently with, or following from, state attorney general investigations has been the subject of scholarly debate. *See, e.g.,* John H. Beisner, Matthew Shors & Jessica Davidson Miller, *Class Action "Cops": Public Servants or Private Entrepreneurs?,* 57 Stan. L.Rev. 1441 (2005); "FTC Workshop," *Class Actions as an Alternative to Regulation: The Unique Challenges Presented by Multiple Enforcers and Follow–On Lawsuits,* 18 Geo. J. Legal Ethics 1311 (2005). Critics of concurrent private class action lawsuits and government investigations, in which private lawyers and attorneys general work together, claim

that the practice may transform the office of the attorney general into a money-making apparatus where private attorneys repeatedly take on projects with the government in order to gain access to its investigative findings and succeed in lucrative class action lawsuits. On the other hand, supporters of partnerships between attorneys general and private class action attorneys argue that class action suits fill the gaps resulting from insufficient government regulation and enforcement, and help to deter industry bad behavior. Proponents also claim that working with attorneys general creates a higher level of political accountability for private attorneys, and that the partnership method is an efficient means of sharing information between the government and the private attorneys.

amount of $70,100,000 while designating the remaining $29,900,000 for policyholders who qualify as Settlement Class Members but opt to claim reimbursement under the Three–State Agreement instead of the Zurich Settlement Agreement. Only if the Zurich Defendants failed to disburse at least $29,900,000 through the Three–State Agreement (all of which would go to policyholders who were eligible for relief under the Zurich Settlement Agreement) would the Zurich Defendants be required to fund the balance to the Settlement Class fund. Thus, the Zurich Defendants were required to pay $70,100,000 under the terms of the Zurich Settlement Agreement and $51,700,000 under the terms of the Multi–State Agreement for a total fund of $121,800,000 for the Settlement Class Members, while $29,900,000 of the amount designated for the Settlement Class in the MOU would be used to fund the $88,000,000 award established by the Three–State Agreement.

Under the terms of the Zurich Settlement Agreement, 51.7% of the settlement fund is allotted to Zurich policyholders who purchased excess casualty insurance during the 2001 to 2004 time period, while Zurich policyholders who purchased other lines of commercial insurance, or who purchased excess casualty policies in other time periods, are allotted 33.9% of the settlement fund, and those Settlement Class Members who are not Zurich policyholders are allotted 9% of the settlement fund.[6] The Zurich Defendants also agreed to separately pay any administration and distribution costs associated with the Zurich Settlement Agreement.

On November 8, 2006, the District Court entered an order preliminarily certifying the Settlement Class and preliminarily approving the proposed Zurich Settlement Agreement. The District Court set January 11, 2007 as a deadline for filing any objections to the Zurich Settlement Agreement and scheduled a fairness hearing for January 26, 2007. Pursuant to the District Court's order, an administrator mailed notice of the proposed settlement to over 3,790,000 Settlement Class Members and also published notice of the fairness hearing in multiple periodicals, including *The New York Times, The Wall Street Journal, USA Today, Business Insurance Magazine, Risk Management Magazine,* and the newspaper with the largest circulation in each of the fifty states and the District of Columbia. The administrator also established a website and toll-free number to provide details of the proposed settlement and offer assistance to the Settlement Class Members.

A total of fifteen potential Settlement Class Members filed timely objections to the proposed Zurich Settlement Agreement.[7] The objections pertained to the sufficiency of the notice, scope of the release and bar order, requirements for submitting claims forms, procedures for requesting exclusion, Plan of Allocation, class certification, and attorneys' fees. At the scheduled fairness hearing before the District Court, eight of the objectors were represented by counsel; however, Van Enterprises, Inc. (Van Enterprises), one of the current appellants, was not among the objectors who appeared before the District

6. As the attorneys general explain, "[m]ost insurance customers structure their insurance coverage in three tiers[:] a level of self-insurance, a level of primary insurance, and one or more levels of excess insurance. The class includes those persons who bought the primary and excess insurance from the defendant brokers."

7. Additionally, a total of 1,067 potential Settlement Class Members filed timely exclusions, opting out of the Zurich Settlement Agreement.

Court, despite having filed a Notice of Appearance. In addition to Class Counsel, the Zurich Defendants, and eight of the objectors, a representative from the Office of the Attorney General of Texas appeared at the fairness hearing on behalf of the intervening attorneys general.[8]

On February 16, 2007, the District Court issued an opinion granting the Zurich Defendants' and the plaintiffs' motion for final approval of the settlement and dismissing, with prejudice, the Zurich Defendants from the litigation. *In re Ins. Brokerage Antitrust Litig.*, 2007 WL 542227 (D.N.J. Feb.16, 2007) (Zurich Settlement Final Approval Opinion). In explaining its decision to grant final approval of the settlement, the District Court chose not to summarize each of the individual challenges raised by the objectors, but it did discuss the general categories of objections that were raised and dismissed each of these types of objection. After rejecting all of the objections, the District Court certified the Settlement Class, finding that it met all of the requirements of Rule 23(a) and (b)(3),[9] and approved the Zurich Settlement Agreement, finding that all of the fairness requirements of Rule 23(e) were met.

Additionally, the Zurich Defendants agreed with the plaintiffs to pay up to $29,950,000 for attorneys' fees, expense reimbursements, and incentive awards for the named plaintiffs, which would not be subtracted from the Settlement Class fund. The parties also agreed that if the District Court granted less than the re-quested fees and expenses or if this amount was later reduced, the Zurich Defendants—not the Settlement Class Members—would be entitled to the difference in amount. Class Counsel filed a motion for an award of fees in the District Court, requesting that the District Court distribute the $29,950,000 as follows: "$3,957,000 for reimbursement of litigation expenses; $150,000 for payment of incentive awards to fifteen Plaintiffs; and $25,803,000 for attorneys fees incurred in the prosecution of this litigation."[10] Various Settlement Class Members filed objections in opposition to the motion for an award of fees. The objections challenged the value of benefits to Settlement Class Members created by Class Counsel in light of the involvement of the attorneys general, the inclusion of time spent on non-Zurich Settlement matters in the calculation of the lodestar, Class Counsel's performance of their gatekeeper function, and the overall amount of the fees. On June 5, 2007, the District Court approved the requested fee award, rejecting all of the objections. *In re Ins. Brokerage Antitrust Litig.*, 2007 WL 1652303 (D.N.J. June 5, 2007) (Zurich Settlement Attorneys' Fees Opinion).

The following objectors filed timely notices of appeal from the District Court's order granting the settling parties' motion for final approval of the settlement: Shapiro & Lodwick Co., LPA, Sports & Spine Physical Therapy, Inc., Irene Pekoe, Hoffman Legal Group, LLC, Lacy Redd and Cross & Sir (07–1759); Romero General Construction Group (07–1763); Dan C.D. Sturdevant (07–1769); Van Enterprises,

---

**8.** The attorneys general who participated in the Multi–State Agreement filed a motion to intervene in the litigation in support of the approval of the Zurich Settlement Agreement, and on September 18, 2006, the District Court granted this motion.

**9.** The plaintiffs asked the District Court to consider only whether the proposed class met the standards set forth in Rule 23(b)(3) and not to consider whether Rule 23(b)(2) was satisfied.

**10.** When these individual amounts are added together, the total is only $29,910,000 and thus is $40,000 short of the requested fee of $29,950,000. The parties do not address this discrepancy.

Inc. (07–1779); Iaad O., Inc. (Trustee of 8 Pacific Street Trust) and Zorkess LLC (07–1786); Emerald Financial Group, Inc. (07–1793); Palomar Grading and Paving, Inc. (07–1796); and Harold Folsom Jensen (07–1826).

The following objectors filed timely notices of appeal from the District Court's order awarding attorneys' fees and expenses: Van Enterprises, Inc. (07–2935); Iaad O., Inc. (Trustee of 8 Pacific Street Trust) and Zorkess LLC (07–2957); Shapiro & Lodwick Co., LPA and Sports & Spine Physical Therapy, Inc. (07–3037); Lacy Redd and Cross & Sir (07–3038); Irene Pekoe and Hoffman Legal Group, LLC (07–3039); Romero General Construction Corp. (07–3040); Dan C.D. Sturdevant (07–3042); Emerald Financial Group, Inc., Palomar Grading and Paving, Inc., and Harold Folsom Jensen (07–3041).[11]

Through various consolidations, the appeals of these objectors from both the District Court's final approval order and its attorneys' fees order have been joined together. Altogether, there are sixteen consolidated appeals related to the Zurich Settlement.

### B. The Gallagher Settlement

In December 2004, the Gallagher Defendants were added to the class action litigation.[12] The Gallagher Defendants were also subject to ongoing investigations by state attorneys general and state insurance departments for possible anticompetitive activities. On May 18, 2005, the Gallagher Defendants, whose principal place of business and headquarters are located in Illinois, entered into an Assurance of Voluntary Compliance with the Attorney General of Illinois and the Director of the Illinois Division of Insurance, and a Stipulation and Consent Order with the Director of the Illinois Division of Insurance. Under the terms of these agreements, the Gallagher Defendants voluntarily implemented various business reforms and transferred $26,962,500 into a fund from which amounts were distributed to certain qualifying Gallagher customers.[13]

In April 2005, the Gallagher Defendants began settlement agreement negotiations with the plaintiffs and, more than a year and a half later, on December 29, 2006, the parties entered into a Stipulation of Settlement (Gallagher Settlement Agreement). Several amendments to the Gallagher Settlement Agreement were filed in the following months, one of which included the submission of a Plan of Allocation. The proposed Gallagher Settlement Agreement called for the creation of a $28,000,000 settlement fund to be paid to insureds who

---

11. Appellants Shapiro & Lodwick Co., LPA; Sports & Spine Physical Therapy, Inc.; Irene Pekoe; Hoffman Legal Group, LLC; Lacy Redd; Cross & Sir; Iaad O., Inc.; and Zorkess LLC jointly filed one appellate brief. In addressing arguments presented by this group, we will refer to them as the Iaad/Zorkess objectors. Appellant Van Enterprises submitted its own appellate brief; therefore, we will identify arguments presented in this brief by referring to Van Enterprises. The remaining appellants filed a motion to adopt the briefs submitted on behalf of the Iaad/Zorkess objectors and Van Enterprises.

12. The Gallagher Defendants are a group of insurance brokers comprised of Arthur J. Gallagher & Co., Arthur J. Gallagher Risk Management Services, Inc., and Gallagher Benefit Services, Inc. The Gallagher Defendants remained parties to both the Commercial Case and the Employee Benefits Case after the District Court created two distinct dockets for the class action litigation.

13. It is unclear from the record whether the Gallagher Defendants entered into similar agreements with other states or were able to resolve all of the state investigations that were pending against them through these agreements.

fell within the definition of the Settlement Class and was intended to "resolve all claims that have been, or could have been, asserted in this action by Plaintiffs against the Gallagher Defendants." The Settlement Class was defined as "all individuals or entities" who "purchase[d] or renew[ed] commercial insurance, or reinsurance thereof, obtained through engaging the services of the Gallagher Defendants" or any Broker Defendant during the class period, and "all individuals or entities" that "were employers providing employee benefits insurance" and employees receiving "employee benefits insurance" through an employer sponsored plan that was obtained through the Gallagher Defendants or any Broker Defendant during the class period. (Gallagher App. 409–10.) For purposes of allocation, the Settlement Class was divided into six separate claimant groups:

"Commercial Class members who purchased or renewed commercial insurance either through a Gallagher Entity ('Commercial Direct Claimants') or a Commercial Broker Defendant ('Commercial Conspiracy Claimants'), Employer members of the Employee Benefits Class who purchased or renewed employee benefits insurance either through a Gallagher Entity ('Employer Direct Claimants') or an Employee Benefit Broker Defendant ('Employer Conspiracy Claimants'), and all Employee members of the Employee Benefits Class who purchased or renewed employee benefits insurance either through a Gallagher Entity ('Employee Direct Claimants') or through an Employee Benefits Broker Defendant ('Employee Conspiracy Claimants')."

Thus the claimant groups were categorized based on the type of insurance involved and whether the insurance was purchased through the Gallagher Defendants or another Broker Defendant. Under the Plan of Allocation, the fund was to be distributed among the claimant groups as follows: 68% to Commercial Direct Claimants, 13.2% to Commercial Conspiracy Claimants, 3.6% to Employer Direct Claimants, 0.5% to Employer Conspiracy Claimants, 13.3% to Employee Direct Claimants, and 1.4% to Employee Conspiracy Claimants.

In addition to establishing a settlement fund, the proposed Gallagher Settlement Agreement also required the Gallagher Defendants to make certain changes to their alleged business practices—such as prohibitions on accepting contingent compensation, "pay to play" arrangements, "bid rigging" arrangements, reinsurance leveraging, and inappropriate use of wholesale insurance brokers—and to make certain disclosures to customers and implement certain training for its employees. The Gallagher Defendants also agreed to pay the administration and distribution costs associated with the Gallagher Settlement Agreement.

On April 13, 2007, the District Court entered an order preliminarily certifying the Settlement Class and preliminarily approving the Gallagher Settlement Agreement. The District Court set June 29, 2007 as the deadline for the filing of exclusions and objections to the proposed Gallagher Settlement Agreement and scheduled a fairness hearing for July 24, 2007. Pursuant to the District Court's order, the administrator mailed notice of the proposed Gallagher Settlement Agreement to over 288,000 potential Settlement Class Members and also published notice of the Gallagher Settlement Agreement twice in *The New York Times, The Wall Street Journal,* and *USA Today,* once in *Business Insurance Magazine* and *Risk Management Magazine,* and once in the newspaper with the largest circulation in each of the fifty states and the District of Columbia. The administrator also estab-

lished a website and toll-free hotline to provide material relevant to the proposed Gallagher Settlement Agreement.

Only two Settlement Class Members filed objections to the Gallagher Settlement Agreement.[14] The objections pertained to the amount of the settlement, requirements of the settlement claim form, the allocation of the settlement, and whether the requirements of class certification were satisfied. One of the two objectors, appellant Van Enterprises—who also objected to the Zurich Settlement— failed to appear at the fairness hearing despite having filed a Notice of Intention to Appear. The District Court issued an order on September 4, 2007, granting the Gallagher Defendants' and plaintiffs' motion for final approval of the settlement and dismissing the Gallagher Defendants from the litigation with prejudice, determining that all of the objections lacked merit and concluding that the Settlement Class could be certified and the Gallagher Settlement Agreement could be approved consistent with the Rule 23 requirements.[15] *In re Ins. Brokerage Antitrust Litig.*, 2007 WL 2589950 (D.N.J. Sept.4, 2007) (Gallagher Settlement Final Approval Opinion).

Separately, the Gallagher Defendants agreed to pay up to $8,885,000 for Class Counsel's attorneys' fees, litigation expenses, and incentive awards for each of the twenty-five named plaintiffs. These fees were not to be deducted from the $28,000,000 settlement fund. No party objected to the petition for fees, and the District Court approved it.

Van Enterprises filed a timely notice of appeal from the District Court's order granting the motion for final approval of the settlement (07–3687) and is the only objector that remains in this appeal.

## II. Jurisdiction

 The District Court had jurisdiction over the Sherman Act and RICO claims, which involved federal questions, pursuant to 28 U.S.C. § 1331 and had supplemental jurisdiction over the state law claims, which arose out of the same common nucleus of operative facts, pursuant to 28 U.S.C. § 1367. Each of the three decisions of the District Court that is under consideration was a final order and we have jurisdiction to review them pursuant to 28 U.S.C. § 1291.[16] "We review a class certification order for abuse of discretion, which occurs if the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 312 (3d Cir.2008) (internal quotation marks omitted). "The decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the district court." *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 299 (3d Cir. 1998) (internal quotation marks omitted). We review a district court's award of attorneys' fees for an abuse of discretion, taking into consideration whether the district court employed the proper legal standards, followed the proper procedures, and made findings of fact that are not clearly erroneous. *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 727 (3d Cir.2001).

---

**14.** In addition, the District Court also received 206 timely requests for exclusion from the proposed Gallagher Settlement Agreement.

**15.** As in the Zurich Settlement, the plaintiffs asked the District Court to consider only whether the requirements of Rule 23(b)(3) were met.

**16.** We consolidated the appeals from the Zurich Settlement and the Gallagher Settlement for purposes of oral argument and disposition.

## III. Analysis of the Final Approval of the Settlements and the Award of Fees

We begin our analysis with an overview of the standards for certifying a settlement class and approving a class action settlement. Next, we review the District Court's decisions in both the Zurich Settlement and the Gallagher Settlement and consider the arguments that the objectors raise with respect to each of these decisions. Finally, we provide an overview of the standards for approving an award of attorneys' fees, and we review the District Court's decision granting Class Counsel's petition for an award of fees in the Zurich Settlement, taking into consideration the arguments that the objectors raise on appeal.

### A. Requirements for Approving Class Settlements

■ In order to approve a class settlement agreement, a district court must determine that the requirements for class certification under Federal Rule of Civil Procedure 23(a) and (b) are met and must determine that the settlement is fair to the class under Federal Rule of Civil Procedure 23(e). As the Supreme Court has made clear:

"Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial. But other specifications of [Rule 23]—those designed to protect absentees by blocking unwarranted or overbroad class definitions—demand undiluted, even heightened, attention in the settlement context."

*Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 620, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (citation omitted). "[I]f a fairness inquiry under Rule 23(e) controlled certifi-

cation, eclipsing Rule 23(a) and (b), and permitting class designation despite the impossibility of litigation, both class counsel and court would be disarmed." *Id.* at 621, 117 S.Ct. 2231. Thus, it is important to "apply[ ] the class certification requirements of Rules 23(a) and (b) separately from [the] fairness determination under Rule 23(e)." *In re Prudential Ins. Co.,* 148 F.3d at 308.

"The requirements of [Rule 23](a) and (b) are designed to insure that a proposed class has 'sufficient unity so that absent class members can fairly be bound by decisions of class representatives.'" *Id.* at 309 (quoting *Amchem,* 521 U.S. at 621, 117 S.Ct. 2231). Under Rule 23(a), the prerequisites to class certification are:

"(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."

Fed.R.Civ.P. 23(a); *see Amchem,* 521 U.S. at 613, 117 S.Ct. 2231. If all of the prerequisites of Rule 23(a) are satisfied, a class action may be maintained if the standards set forth in Rule 23(b) are satisfied as well. Fed.R.Civ.P. 23(b). Rule 23(b)(3) requires "the court [to] find[ ] that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3); *see also Amchem,* 521 U.S. at 618, 117 S.Ct. 2231 ("Among current applications of Rule 23(b)(3), the 'settlement only' class has become a stock device."). The "[f]actual determinations necessary to make Rule 23 findings must be made by a preponderance

of the evidence. In other words, to certify a class the district court must find that the evidence more likely than not establishes each fact necessary to meet the requirements of Rule 23." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 320. Accordingly, "[c]lass certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23 are met." *Id.* at 309 (internal quotation marks omitted).

 "Even if it has satisfied the requirements for certification under Rule 23, a class action cannot be settled without the approval of the court and a determination that the proposed settlement is fair, reasonable and adequate." *In re Prudential Ins. Co.*, 148 F.3d at 316 (internal quotation marks omitted); *see* Fed.R.Civ.P. 23(e)(2) (stating that a district court may approve a proposed settlement "only after a hearing and on finding that it is fair, reasonable, and adequate"). In *Girsh v. Jepson*, our Court articulated nine factors to be considered when determining the fairness of a proposed settlement:

> " '(1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.' "

521 F.2d 153, 157 (3d Cir.1975) (internal quotation marks and alterations omitted). "[W]here settlement negotiations precede class certification, and approval for settle-

ment and certification are sought simultaneously, we require district courts to be even more scrupulous than usual when examining the fairness of the proposed settlement." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 534 (3d Cir. 2004) (internal quotation marks omitted).

## B. Challenges to the Approval of the Zurich Settlement

### 1. The District Court's Analysis

The District Court granted final approval of the Zurich Settlement after concluding that the Rule 23 requirements were satisfied. Specifically, the District Court determined that the proposed Zurich Settlement Class met the standards established by Rule 23(a) because the large, nationwide class of plaintiffs "easily satisfies the numerosity requirement" of subsection (a)(1); the "many common questions of law and fact" satisfy the commonality requirement of subsection (a)(2); the claims of the named plaintiffs are "indistinguishable" from those made on behalf of the settlement class and "encompass[ ] identical allegations" arising "from the same course of action taken by the Zurich Defendants," which satisfies the typicality requirement of subsection (a)(3); and the dual components of the adequacy of representation requirement of subsection (a)(4) are satisfied because the attorneys representing the named plaintiffs are "clearly 'well qualified and experienced class action attorneys,' " and the interests of the named plaintiffs "are not antagonistic to those of the absent class members." Zurich Settlement Final Approval Opinion at *13–15.

The District Court also concluded that the standards of Rule 23(b)(3) were met, finding that the predominance requirement was satisfied due to the "identical claims of both the named Plaintiffs and the absent class members aris[ing] from the same set

of facts regarding the alleged collusive and anticompetitive behavior of the Zurich Defendants," and the superiority requirement was satisfied because litigating all of these claims "in one action is ... far more desirable than numerous separate actions litigating the same issues." *Id.* at *16. Thus, the District Court concluded that the class established by the Zurich Settlement Agreement met all of the requirements of Rule 23(a) and (b)(3). The District Court noted that Van Enterprises had asserted in its written objection that the Settlement Class "lacks commonality, typicality, adequacy of representation and a predominance of common issues," but the District Court rejected these contentions because Van Enterprises "provide[d] no cogent argument or legal basis to support these assertions, failing to reference a *single* case, from this or any other Court, that might explain its allegations." *Id.* at *17.

The District Court also considered the fairness of the Zurich Settlement Agreement and found that none of the *Girsh* "factors suggest[s] that the proposed settlement should not be approved." *Id.* at *4. The District Court found that the first five *Girsh* factors "overwhelmingly weigh in favor of approval of [the] settlement." *Id.* As to the first factor—complexity, expense, and likely duration of the litigation—the District Court determined that "this case involves highly complex legal

and factual issues ... [that] would undoubtedly [lead to] a costly and lengthy [litigation] process for all parties" and that "[t]his proposed settlement provides an immediate benefit to the Plaintiffs." *Id.* Applying the second factor, the District Court "conclude[d] that the small number of objections by Class Members to the settlement award, more specifically, to the calculation of the settlement award and damages resulting from the conduct of the Zurich Defendants, strongly weighs in favor of approval." *Id.* at *5. The District Court determined that, under the third factor, the stage of proceedings and the amount of discovery completed weighed in favor of settlement because, "[b]ased upon the amount of time Counsel expended in negotiations and the extent of the discovery process, ... Counsel had a thorough appreciation for the merits of the case prior to settlement." *Id.* at *6. With respect to the fourth and fifth factors, the District Court concluded that the risks of establishing both liability and damages weighed in favor of settlement because "[t]his case involves difficult factual and legal issues which would have translated into protracted litigation and accumulating expenses, in both time and money." *Id.* The District Court concluded its *Girsh* analysis by determining that the final four factors weighed "slightly or moderately in favor of approval." *Id.* at *8.[17]

---

**17.** As we noted in *In re Prudential Insurance Co. America Sales Practice Litigation Agent Actions*, 148 F.3d 283, 323 (3d Cir.1998), depending on the facts of a given case, "it may be useful to expand the traditional *Girsh* factors to include, when appropriate," additional factors "that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages," as well as "the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved—or likely to be achieved—for other claimants; whether

class or subclass members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable." The *Prudential* factors relevant here weigh in favor of the Zurich Settlement. For example, class members had a right to opt out, and some did so, *see* Zurich Settlement Final Approval Opinion at *5; the District Court found the claims processing procedure fair and reasonable, *see id.* at *10, and we agree; and the attorneys' fees award-

Prior to certifying the class and approving the Zurich Settlement, the District Court addressed objections regarding the failure to utilize subclasses. Certain objectors claimed that three subclasses were necessary due to the allocation of funds under the Zurich Settlement Agreement, and that each of these subclasses was entitled to separate representation.[18] The District Court acknowledged that the use of subclasses is appropriate where members of a class have "interests divergent from the rest of the class," but determined that the objectors here "failed to raise, let alone describe, *any* divergent or antagonistic interests between the three groups." *Id.* at *18. The District Court also noted that "[a] class need not be divided into subclasses merely because different groups have alternative legal theories for recovery, or because those groups have different factual bases for relief." *Id.* at *17. Therefore, the District Court rejected the objection.

### 2. The Objectors' Arguments on Appeal

On appeal, there are two principal groups of objectors: Van Enterprises, who submitted a brief on its own behalf, and the Iaad/Zorkess objectors, who submitted a joint brief on behalf of several objectors.[19] Van Enterprises presents numerous arguments in its opening brief before this Court. Briefly stated, Van Enterprises currently challenges the District Court's certification of the class, arguing that it failed to rigorously analyze the Rule 23 requirements and, in particular, that the

Settlement Class is overbroad, resulting in a predominance of individual issues as opposed to common ones. Van Enterprises also argues that the named plaintiffs lack standing because they have not demonstrated an injury in fact. Both Van Enterprises and the Iaad/Zorkess objectors challenge the District Court's failure to utilize subclasses despite the allocation of the settlement fund to various types of policyholders. The Iaad/Zorkess objectors also challenge the District Court's award of $29,950,000 in attorneys' fees and expenses.[20]

### a. Failure to Preserve Arguments on Appeal

At the outset, the plaintiffs assert that Van Enterprises failed to properly preserve its arguments with respect to the Zurich Settlement. They contend that the arguments Van Enterprises now raises on appeal were not preserved by Van Enterprises' written objection in the District Court, in which Van Enterprises attempted to merely "incorporate by reference into its objection every argument raised in every brief, declaration and exhibit that was submitted in connection with Plaintiffs' motion for class certification, as well as the Defendants' motion to dismiss." In other words, the plaintiffs argue that this "conclusory" written objection "simply cannot serve to preserve for appeal the sprawling arguments it now raises concerning certification of the Settlement Class." The plaintiffs also point out that "Van failed to attend the Fairness Hearing, during which it could have elaborated

---

ed in conjunction with the settlement are reasonable, *see infra* Part III.D.

**18.** The suggestion was to create three subclasses: Excess Claimants, Non–Excess Claimants, and Conspiracy Claimants.

**19.** *See supra* note 11.

**20.** Although Van Enterprises objected to the petition for attorneys' fees and filed a notice of appeal from the District Court's order granting attorneys' fees, it did not, on appeal, raise any arguments related to the award of fees.

on its cryptic arguments made entirely by reference." Thus, the plaintiffs contend that the only arguments Van Enterprises preserved for appeal pertain to the Plan of Allocation and the purported need for sub-classes.

Although Van Enterprises frequently cites submissions to the District Court in the Commercial Case litigation—instead of its own written objection—as support for the various arguments it advances on appeal, Van Enterprises asserts that its written objection preserved all of these arguments because the objection "incorporated the motions, responses, briefs, declarations and exhibits filed by the Plaintiffs and Defendants concerning class certification of a litigation class." Van Enterprises argues that the District Court erred by not considering these "adversarial motions and briefing for a Litigation Class despite emphatic requests from the non-settling Defendants and Van Enterprises."[21]

■ As an initial matter, although Van Enterprises did not appear at the fairness hearing to argue its objections, its absence from the hearing did not cause it to forfeit the objections it had timely submitted to the District Court in written form. Van Enterprises acted in accordance with the notice provided to the potential Settlement Class Members, which stated that attendance at the hearing was not necessary so long as an objection was properly filed with the District Court by the deadline:

> "If you are a Settlement Class Member . . . and do *not* exclude yourself from the Settlement Class, you may object to the Zurich Settlement, any term of the Zurich Settlement Agreement, the Plan of Allocation or Plaintiffs' application for

attorneys' fees and expenses. Such objection must be in writing and must provide evidence of your membership in the Settlement Class. The written objection also should state the specific reason(s), if any, for the objection, including any legal support you wish to bring to the Court's attention and any evidence you wish to introduce in support of the objection. A written objection (and any support for it) must be received by the Court and the following counsel by no later than January 11, 2007.

* * *

> If (and only if) you make a written objection to the Zurich Settlement as set out above, you may choose to speak— either in person or through an attorney hired at your own expense—at the hearing . . . the Court has set to consider whether to approve the Zurich Settlement. You are not required to attend the hearing. Lack of attendance at the hearing will not prevent the Court from considering your objection."

(Zurich App. 3077–79.) Thus, while it was necessary for Van Enterprises to provide the grounds for its objections in writing in order to preserve its arguments for appeal, it was unnecessary for it to appear at the hearing.

■ However, we are not obligated to entertain all of the arguments that Van Enterprises presently advances. "Absent exceptional circumstances, this Court will not consider issues raised for the first time on appeal." *Del. Nation v. Pennsylvania,* 446 F.3d 410, 416 (3d Cir.2006) (citing *Harris v. City of Phila.,* 35 F.3d 840, 845 (3d Cir.1994)); *see also Salvation Army v.*

---

**21.** The fact that Van Enterprises repeatedly refers to documents which the non-settling Broker and Insurer Defendants in the Commercial Case litigation submitted to the District Court is troubling. We find it peculiar

that Van Enterprises' interests are so closely aligned with the non-settling defendants, but nonetheless we accept these arguments at face value.

*Dep't of Cmty. Affairs of N.J.*, 919 F.2d 183, 196 (3d Cir.1990) ("The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases." (internal quotation marks omitted)). For an issue to be preserved for appeal, a party "must unequivocally put its position before the trial court at a point and in a manner that permits the court to consider its merits." *Shell Petroleum, Inc. v. United States*, 182 F.3d 212, 218 (3d Cir.1999). A fleeting reference or vague allusion to an issue will not suffice to preserve it for appeal, so "the crucial question regarding waiver is whether defendants presented the argument with sufficient specificity to alert the district court." *Keenan v. City of Phila.*, 983 F.2d 459, 471 (3d Cir.1992); *see also Frank v. Colt Indus., Inc.*, 910 F.2d 90, 100 (3d Cir.1990) ("Particularly where important and complex issues of law are presented, a far more detailed exposition of argument is required to preserve an issue."). Thus, the arguments that were properly preserved for appeal are limited to those which Van Enterprises presented with at least a minimum level of thoroughness to the District Court through its written objection and, without the existence of compelling circumstances, we need not entertain challenges to the approval of the Zurich Settlement which were not before the District Court.[22]

Turning to the substance of Van Enterprises' written objection, we are able to discern that Van Enterprises' principal challenges to the approval of the Zurich Settlement are that the Settlement Class is overbroad—which impacts the Rule 23 requirements of commonality, typicality, and predominance of common issues—and that antagonistic interests among the class members exist such that, in the absence of separate subclasses, the adequacy of representation requirement is not satisfied and the Plan of Allocation is not fair. (Zurich App. 2439.) Van Enterprises did not offer much support in its written objection to substantiate its argument that the Rule 23 requirements are not satisfied, but rather posited that the Settlement Class should not be certified unless the litigation class can properly be certified, and thus Van Enterprises asserted that the District Court needed to consider all of the filings in the class action litigation that have a bearing on whether certification of the litigation class is appropriate. Van Enterprises also did not substantiate its argument that subclasses were needed to ensure a fair allocation of the settlement fund other than to say that the Plan of Allocation treats various types of policyholders differently.

Although Van Enterprises detracts from the credibility and persuasiveness of its objections by presenting them in such a conclusory fashion, we nonetheless will credit its explicit mention of the commonality, typicality, and predominance requirements of Rule 23(a) and (b), as well as its brief discussion of the need for subclasses—which touched on both the adequacy of representation requirement of Rule 23(a) and the fairness of the Plan of Allocation under Rule 23(e)—and will consider these specific challenges on appeal. But beyond

---

**22.** Because Van Enterprises failed to appear before the District Court at the fairness hearing, Van Enterprises forfeited the opportunity to zealously advocate its objections in person and expound upon the challenges that it raised in its written objection. A practical consequence of Van Enterprises' failure to appear at the fairness hearing, combined with its submission of a relatively sparse written objection, is that its grounds for challenging the approval of the settlement were not well-developed and, not surprisingly, were not persuasive to the District Court.

these objections, Van Enterprises has forfeited the opportunity to challenge other aspects of the District Court's decision to approve the Zurich Settlement by failing to make any mention of those arguments in its written objection.[23]

The attorneys general argue that among the issues that Van Enterprises has failed to preserve for appeal is its challenge to the named plaintiffs' standing. The attorneys general assert that the standing issue "was not addressed in Van's original objection.... If Van had seriously believed there was an issue of standing, it could have raised it at the District Court level." They also note that "[i]n the related 'Gallagher' settlement, Van raised the [standing] argument and was denied by the same District Judge as here."

We agree that Van Enterprises' objection is devoid of any reference, express or implied, to the named plaintiffs' standing and there is no basis for construing the objection as containing such a challenge. In a somewhat telling statement, Van Enterprises now argues that "no standing issues were addressed by the Settling Parties and District Court in connection with [the Zurich] Settlement Class." The likely explanation for the absence of a standing analysis is that no challenge was made to the plaintiffs' standing and the District Court did not otherwise discern a reason to include a discussion of the plaintiffs' standing in its opinion. That said, because "[s]tanding is a threshold jurisdictional requirement, and we have an obligation to examine our own jurisdiction and that of the district courts," we will briefly address whether the named plaintiffs have standing. *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.,* 399 F.3d 248, 254 (3d Cir.2005)

(internal quotation marks and citation omitted).

Turning to the "irreducible constitutional minimum" of standing, the Supreme Court has articulated three requirements:

"First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized and (b) 'actual or imminent, not conjectural or hypothetical.' Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court.' Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.' "

*Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal citations and select quotation marks omitted).

Van Enterprises argues that "the named Plaintiffs do not allege and have not shown that any of their policies were subject to the improper use of contingent commission agreements," and thus they have not established an injury in fact. Van Enterprises contends that, at best, "Plaintiffs allege that the entire class paid 'higher prices that arguably ensued in [the] entire industry' as a result of Defendants' allegedly anticompetitive conduct directed at some subset of Class Members."

In response, the attorneys general assert that "at least seven of the named plaintiffs purchased Zurich insurance policies," and that this "is sufficient to establish standing for class certification pur-

---

**23.** In total, Van Enterprises presented eighteen sub-arguments in its opening brief on appeal. While we have identified the objec-

tions that were preserved, we will not list all of the current objections that were not preserved.

poses" because "[o]nce a named Plaintiff has been shown to have standing and therefore [is] properly before the Court," the focus shifts to "compliance with the provisions of Rule 23." Alternatively, the plaintiffs argue that "because the Settlement Class is limited to those policyholders with a 'direct and immediate relationship' to a Defendant coconspirator in this Action, and because all Settlement Class Members purchased insurance at prices elevated by Defendants' unlawful scheme, all members of the Settlement Class have been injured by the anticompetitive conduct described in the Complaint and therefore have standing." They add that "the payment of contingent commissions drove up the costs of all insurance policies" because "[t]hrough a process called 'premium build-up' the contingent commissions paid by insurers were built into formulas used to derive all rates."

■ Van Enterprises' arguments must be rejected because it is clear that the named plaintiffs alleged a concrete and particularized injury in fact. The plaintiffs alleged that they paid supra-competitive prices for their insurance policies as a result of the contingent commission arrangements and other anticompetitive conduct of the Zurich Defendants. This increase in price constitutes a concrete injury in fact. Moreover, because the named plaintiffs purchased insurance policies from the Zurich Defendants during the relevant class period, their injuries are neither generalized nor speculative. This is not to say that the named plaintiffs have proven that they were injured by the Zurich Defendants, but they are not required to prove their injuries in order to establish that they are a proper party to bring their claims before the court. Additionally, the plaintiffs alleged that the economic harm they suffered can be traced to the Zurich Defendants' conduct and these injuries can be redressed by imposing liability on the Zurich Defendants. Therefore, we are satisfied that the case and controversy requirement of Article III is met and that the named plaintiffs had standing to bring this case.

### b. Challenges to Class Certification

■ Turning to the merits of Van Enterprises' preserved objections to class certification, Van argues that "[t]he District Court failed to rigorously analyze the Rule 23 criteria before certifying this Settlement Class." Although Van Enterprises speaks in general terms about all of the Rule 23 requirements, Van's arguments are primarily directed at the predominance component of Rule 23(b)(3).[24] Nonetheless, to the extent that Van Enterprises continues to argue that the commonality and typicality requirements of Rule 23(a) were not satisfied (as it did in its written objection), we reject any such argument. The District Court correctly noted that " 'commonality does not require an identity of claims or facts among class members'; rather, '[t]he commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class.' " Zurich Settlement Final Approval Opinion at *13 (quoting *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 183 (3d Cir.2001)). Indeed, the District Court listed several common questions of law and fact before concluding that the commonality requirement was satisfied. We find no error in this determina-

---

**24.** There is no indication that Van Enterprises contests the District Court's finding that the superiority requirement of Rule 23(b)(3) was satisfied and it is beyond dispute that no such argument was preserved in Van Enterprises' written objection. Therefore, we will not address this aspect of Rule 23(b)(3).

tion. And with respect to the typicality requirement, the District Court stated that " 'if the claims of the named plaintiffs and class members involve the same conduct by the defendant, typicality is established.' " *Id.* at \*14 (quoting *Newton,* 259 F.3d at 183–84). Based on this standard, the District Court explained:

> "Here, the claims made by named Plaintiffs and those made on behalf of the Settlement Class Members are indistinguishable, encompassing identical allegations that the Zurich Defendants violated RICO, federal and state antitrust laws, and the common law obligation of fiduciary duty. These claims arise in each case from the same course of action taken by the Zurich Defendants. Consequently, the named Plaintiffs' claims are typical of those brought by the Settlement Class Members at large."

*Id.* We discern no error in this finding either. Although we are satisfied with the District Court's analysis of the commonality and typicality requirements of Rule 23(a), we think that Van Enterprises' challenge to the predominance requirement of Rule 23(b)(3) calls for a closer look.

As part of its challenge to the District Court's finding of predominance, Van Enterprises argues that "the Settling Parties and the District Court did not address how antitrust injury could be shown with common proof for this overbroad Settlement Class that includes class members who did not purchase insurance from any Insurer Defendant or who utilized a broker who is not even alleged to be part of the conspiracy" and that "[d]ue to the overbroad class definition, even the question of whether there is an antitrust conspiracy under federal or state law is not common to the class." Van Enterprises makes similar arguments in the context of the plaintiffs' RICO claim as well. Briefly stated, Van Enterprises argues: "The Settling Parties and the District Court did not address whether the named Plaintiffs or Settlement Class members had standing to bring a RICO claim, whether there was a uniform misrepresentation or omission to the class, whether proximate causation and financial loss were common to the class, or the applicability of the filed rate doctrine." Through these arguments, Van Enterprises attempts to demonstrate that common issues do not predominate with respect to the antitrust claims and that "[i]ndividual questions remain that would have to be separately adjudicated." [25]

The plaintiffs respond that "Van's arguments regarding common impact and common injury ignore that Plaintiffs' claims and the Settlement Class Members' claims are identically predicated on the Zurich

---

**25.** None of these particular arguments was raised in Van Enterprises' written objection. Nonetheless, because of the magnitude of this settlement—both in terms of the amount of money involved and the number of persons affected—we will exercise our discretion to consider these arguments. The significance of this litigation, in combination with our independent obligation to ensure the fairness of the settlement for absent class members, persuades us to entertain these newly developed arguments on appeal. But our decision to construe liberally Van Enterprises' written objection to encompass the more detailed reasons now offered for its challenge to the predominance requirement should in no way be interpreted as sanctioning Van Enterprises' conduct. For this reason, we reiterate that Van Enterprises should have presented these arguments to the District Court so that it could have incorporated such considerations into its own analysis, and ordinarily claims raised in this manner will be deemed waived. Additionally, while we recognize that the District Court's discussion of the predominance requirement was not particularly detailed, we think that its treatment of this requirement was understandable given the conclusory objection that Van Enterprises made to predominance. The District Court's analysis, though brief, was more thorough than Van Enterprises' objection on this point.

Defendants' actions" and that, as a result, "the district court's finding of predominance was not an abuse of discretion." The plaintiffs also argue that Van Enterprises' challenges to the merits of the claims "have no relevance to the determination of whether to certify a settlement class." To this argument, the attorneys general add that Van Enterprises simply accuses the District Court of "not read[ing] enough briefs, enough declarations, enough reports, enough memoranda, enough cases or enough evidence to support approval of class certification and settlement."

The Supreme Court has explained that "[t]he Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation," which imposes a standard "far more demanding" than the Rule 23(a) commonality requirement. *Amchem*, 521 U.S. at 623–24, 117 S.Ct. 2231. Whereas "Rule 23(a)(2)'s commonality element requires that the proposed class members share at least one question of fact or law in common with each other," the Rule 23(b)(3) predominance element "requires that common issues predominate over issues affecting only individual class members." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d at 527–28. Hence, we consider the Rule 23(a) commonality requirement to be incorporated into the more stringent Rule 23(b)(3) predominance requirement, and therefore deem it appro-priate to "analyze the two factors together, with particular focus on the predominance requirement." *Id.* at 528; *accord Danvers Motor Co. v. Ford Motor Co.*, 543 F.3d 141, 148 (3d Cir.2008) ("[W]here an action is to proceed under Rule 23(b)(3), the commonality requirement is subsumed by the predominance requirement." (internal quotation marks omitted)). Because class certification is unsuitable where "proof of the essential elements of the cause of action requires individual treatment," *Newton*, 259 F.3d at 172, we will "examine the elements of plaintiffs' claim through the prism of Rule 23 to determine whether the District Court properly certified the class," *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 311 (internal quotation marks omitted).

Here, the District Court relied on its Rule 23(a) commonality analysis in assessing the predominance requirement of Rule 23(b)(3). After setting forth general principles about the predominance requirement, the District Court, interpreting precedent from our Court, noted that "because the 'clear[ ] focus' of an antitrust class action is 'on the allegedly deceptive conduct of defendant' and not on 'the conduct of individual class members,' common issues necessarily predominate."[26] Zurich Settlement Final Approval Opinion at *15 (quoting *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d at 528). The District Court then provided the following explana-

---

**26.** We do not read the District Court's statement as implying that common issues necessarily predominate in every antitrust case; such a proposition would be incorrect. *See In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 321–22 ("We recognize the Supreme Court has observed that '[p]redominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws.' But it does not follow that a court should relax its certification analysis, or presume a requirement for certification is met, merely because a plaintiff's claims fall within one of those substantive categories." (citation omitted)). Rather we construe this statement together with the District Court's identification of various issues in the present case that are common to the class. In doing so, we interpret the District Court's statement as indicating that, in this case, given the common issues of law and fact which stem from the conduct of the defendants, the predominance requirement is necessarily met.

tion in support of finding the predominance requirement satisfied:

"Here, as discussed in the sections on commonality and typicality, the identical claims of both the named Plaintiffs and the absent class members arise from the same set of facts regarding the alleged collusive and anticompetitive behavior of the Zurich Defendants. Consequently, the predominance requirement is satisfied."

*Id.* at *16. In its earlier discussion of the commonality requirement, the District Court listed the following as examples of the common questions of law and fact:

"(1) whether the Zurich Defendants entered into a conspiracy to allocate the market for the sale of insurance; (2) whether the Zurich Defendants' alleged conspiracy had the purpose and effect of unlawfully restraining competition in the insurance industry; (3) whether the Zurich Defendants' conduct violated Section 1 of the Sherman Act; (4) whether the Zurich Defendants' conduct breached their fiduciary duty to their clients; and (5) whether the actions of the Zurich Defendants violated the RICO statute."

*Id.* at *13.

Reading the District Court's commonality and predominance analyses together, as is appropriate in this context, *see In re Warfarin Sodium Antitrust Litig.*, 391 F.3d at 528, it is clear that the District Court identified several significant—albeit broad—common issues, even if it did not further refine its analysis by assessing the individual elements of the plaintiffs' claims. However, as we indicated earlier, the District Court was not presented with a vigorous challenge to the predominance requirement, which may have influenced its decision not to provide a more thorough analysis of this issue. In order to ensure that the District Court applied the correct legal standard and acted within its discretion in certifying this class, we will conduct a Rule 23(b)(3) predominance analysis for ourselves, building on the foundation provided by the District Court.

Because our task calls for us to "examine the elements of plaintiffs' claim through the prism of Rule 23," *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 311 (internal quotation marks omitted), we begin with the elements of the plaintiffs' federal antitrust claim. Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1. "To establish a violation of Section 1, a plaintiff must prove: (1) concerted action by the defendants; (2) that produced anticompetitive effects within the relevant product and geographic markets; (3) that the concerted actions were illegal; and (4) that it was injured as a proximate result of the concerted action." *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 207 (3d Cir. 2005) (citing *Petruzzi's IGA Supermarkets, Inc. v. Darling-Del. Co.*, 998 F.2d 1224, 1229 (3d Cir.1993)). The Supreme Court has explained that Section 1 of the Sherman Act " 'does not prohibit [all] unreasonable restraints of trade . . . but only restraints effected by a contract, combination, or conspiracy,' " and therefore " '[t]he crucial question' is whether the challenged anticompetitive conduct 'stem[s] from independent decision or from an agreement, tacit or express.' " *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (citations omitted); *see Gordon*, 423 F.3d at 207 ("The essence of a Section 1 claim is the existence of an agreement.").

Turning to the plaintiffs' allegations, we consider whether common questions of law and fact exist with respect to each of these

elements. Because the first and third elements of a Sherman Act violation focus on the conduct of the defendants, we find that common questions abound with respect to whether the defendants engaged in illegal, concerted action. For example, common questions relevant to these two elements include whether the Zurich Defendants agreed with any of the Broker Defendants to pay contingent commissions in exchange for an allocation of a certain amount of business in the insurance market, whether the Zurich Defendants conspired with any Insurer Defendants to reduce competition and allocate the market among a select group of insurers, whether the Zurich Defendants agreed not to compete for other Insurer Defendants' customers in return for incumbent protection of their own customers, whether the Zurich Defendants shared a common objective of reducing competition among the other Insurer Defendants as opposed to merely engaging in parallel conduct, whether there was a discernible division of the insurance market which amounted to an illegal restraint of trade, and whether these agreements constituted horizontal restraints of trade that are per se illegal. The second element of a Sherman Act violation, which focuses on the effects of the defendants' challenged conduct, also involves common questions in the present case, including whether the Zurich Defendants' actions reduced competition for insurance, whether the Zurich Defendants' actions resulted in a consolidation of the insurance industry, and whether the Zurich Defendants' actions produced an increase in the cost of premiums for commercial insurance.

The fourth element of a Sherman Act violation, which addresses whether the plaintiffs suffered an antitrust injury, is at the center of Van Enterprises' challenge to the District Court's Rule 23(b)(3) predominance finding. In the context of class certifications, we have stated that "impact often is critically important for the purpose of evaluating Rule 23(b)(3)'s predominance requirement because it is an element of the claim that may call for individual, as opposed to common, proof." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 311. Accordingly, for purposes of class certification pursuant to Rule 23(b)(3), "the task for plaintiffs ... is to demonstrate that the element of antitrust impact is capable of proof at trial through evidence that is common to the class rather than individual to its members." *Id.* at 311–12. For this reason, although the fourth element focuses on whether the plaintiffs were injured by the defendants' conduct, it may still involve common questions of law and fact if proof of injury can be established on a classwide basis.

Van Enterprises argues that antitrust injury cannot be proven on a class-wide basis because the Settlement Class includes class members who did not purchase insurance from an Insurer Defendant or utilize a Broker Defendant. The plaintiffs counter that antitrust injury is a question that is common to the class because "Contingent Commissions ... are included in each insurer's ratemaking formulas and are consequently 'built' into every commercial premium for commercial insurance products," and "the conspiratorial conduct of all Defendants (including Zurich) reduced or eliminated competition for insurance products, thereby raising the insurance premiums paid by Plaintiffs and all members of the class." Thus, they argue that all class members were injured by the Zurich Defendants' anticompetitive conduct, even if the extent of their injuries varied. The attorneys general likewise argue that "[c]ontingent commissions paid by insurers were built into the premiums charged to members of the class which resulted in supra competitive premium

prices to insurance consumers," and that "[a]s a result of the Defendant's conduct, Plaintiffs and unnamed class members have paid insurance premiums in excess of what they would have paid had the Broker Defendants acted in accordance with their fiduciary duties and their representations to their clients."

■ As the arguments of the plaintiffs and attorneys general illustrate, whether the named plaintiffs and absent class members were proximately injured by the conduct of the Zurich Defendants is a question that is capable of proof on a class-wide basis. Contrary to Van Enterprises' assertion, the Settlement Class only includes policyholders who purchased insurance directly from the Zurich Defendants and policyholders who utilized one of the Broker Defendants, and therefore the plaintiffs' theory for proving antitrust injury would apply to all of the class members. Consequently, we are satisfied that the element of antitrust injury—that is, the fact of damages—is susceptible to common proof, even if the amount of damage that each plaintiff suffered could not be established by common proof. Unlike in *In re Hydrogen Peroxide Antitrust Litigation*, where the certification inquiry was set against the backdrop of an impending trial, here we are not as concerned with "formulat[ing] some prediction" as to how this element of a Sherman Act violation would "play out" at trial, 552 F.3d at 311 (internal quotation marks omitted), "for the proposal is that there be no trial," *Amchem*, 521 U.S. at 620, 117 S.Ct. 2231, and instead our inquiry into the element of antitrust injury is solely for the purpose of ensuring that issues common to the class predominate over individual ones. As the foregoing analysis demonstrates, common questions exist even with respect to the element of antitrust injury and therefore any individual issues do not overwhelm the common ones. Because each of the elements of a Sherman Act violation involves common questions of law and fact, we conclude that common questions predominate over individual ones with respect to the federal antitrust claim.

■ Next, we consider the essential elements of the plaintiffs' RICO claim. The RICO statute provides, in relevant part:

"It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity...."

18 U.S.C. § 1962(c). Establishing liability under this section of the RICO statute "requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity," plus an injury to "business or property." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985) (footnote omitted); *see Lum v. Bank of Am.*, 361 F.3d 217, 223 (3d Cir.2004). Under Section 1962(d), "[i]t is also unlawful for anyone to conspire to violate § 1962(c)." *Lum*, 361 F.3d at 223. Section 1961(1) of RICO provides a list of the federal and state crimes which constitute "racketeering activity" and includes mail and wire fraud, and Section 1961(4) of RICO defines the term "enterprise" to "include[ ] any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

■ Proving the first element of a RICO violation in this case would involve common questions about the activities of the Zurich Defendants and, in particular, whether the Zurich Defendants participated or engaged in conduct with other Insurer Defendants and Broker Defendants. The second element also involves common

questions of law and fact, namely whether an enterprise of Broker Defendants and Insurer Defendants existed (of which the Zurich Defendants were a part) either as an association in fact or as a more formal organization or entity. Proving the third and fourth elements would encompass common questions of law and fact as well, including whether activities that constitute racketeering were taking place through the enterprise (such as mail or wire fraud) and whether these racketeering activities were recurring such that a pattern could be established. While establishing an injury is not as conducive to common proof because it requires that a plaintiff demonstrate harm to his property or business, for the reasons already set forth in our discussion of the element of antitrust impact, we are satisfied that the plaintiffs have presented a plausible theory for proving a class-wide injury as a result of the racketeering activities of the alleged enterprises at issue here. Thus, each element of the alleged RICO violation involves common questions of law and fact.

Based on our analysis of the essential elements of the plaintiffs' federal claims, we agree with the District Court's conclusion that common questions of law and fact predominate over any individual ones, and therefore the predominance requirement of Rule 23(b)(3) is satisfied.

### c. Challenges to the Plan of Allocation

Both Van Enterprises and the Iaad/Zorkess objectors present challenges related to the Plan of Allocation, arguing that subclasses were needed to ensure adequate representation for the various types of policyholders and to ensure a fair allocation of the settlement fund. Specifically, the Iaad/Zorkess objectors argue that the District Court abused its discretion by failing to require the establishment of subclasses and separate representation for the Excess and Non–Excess Claimants.[27] They also contend that "no informal procedures designed to mimic subclassing were employed" and "the increased recovery of one sub-class was achieved at the expense of another subclass' diminished recovery." Van Enterprises argues that, because not all of the class members purchased insurance directly from the Zurich Defendants, the class members have antagonistic interests and should not be represented by one set of lawyers. Instead, according to Van Enterprises, subclasses should have been certified and, as a result of the District Court's decision not to require subclasses and separate representation, the Plan of Allocation was not fair.[28]

The plaintiffs respond that there are no divergent interests among the class members because "[t]he groups for intra-class allocation were created solely for economic reasons to provide a fair distribution of the Settlement proceeds among the Settlement Class Members," and explain that "[t]he relief was tailored to the individual policyholders' circumstances, and the structure of the distribution does not create intra-class conflicts." They contend that "[t]he Settlement Class Members are all in the

---

**27.** Again, "Non–Excess Claimants" refers to those policyholders who purchased a primary insurance policy from or through one of the defendants whereas "Excess Claimants" refers to those policyholders who purchased additional insurance policies—in excess of their primary insurance coverage—from or through one of the defendants.

**28.** Although Van Enterprises argues that "[t]here is significant disparate treatment" between the three groups that results from the Plan of Allocation, Van Enterprises does not specify why the settlement is not fair, reasonable, and adequate for any particular type of policyholder.

same position vis-a-vis the Zurich Defendants; they are policyholders that were hampered by the same alleged activities engaged in by the Zurich Defendants." Moreover, they defend the Plan of Allocation by arguing that it "was prepared by Class Counsel, with the substantial assistance of economic experts and the Intervenor Attorneys General, in such a way as to fairly allocate the recovery among Settlement Class Members in accordance with Plaintiffs' theories of potential damages in the Action." They maintain that the objectors "fail to recognize that the Plan of Allocation is designed to reflect certain differences in the impact of the Defendants' conduct in certain lines of insurance during different years."

The attorneys general also argue that subclasses were not necessary in this settlement and that the Plan of Allocation was fair. They contend that the objectors are essentially "complain[ing] that the comparatively weak claims receive comparatively less economic redress" and that "[t]his type of disparity is common in class cases without establishing subclasses." Additionally, the attorneys general state: "Payment among class members will vary depending on the type of insurance policy they purchased, but that type of variation has never been held to warrant subclasses, especially where the variation in payment is based on the variations in the strength of cases involving particular insurance products." The attorneys general also assert that because "the purchasers of excess and non-excess insurance are all known, have been noticed and are the same persons," this case is distinguishable from other cases in which subclasses were required. In sum, the attorneys general assert that "there can be no need for subclasses where the difference involved different claims by many of the same persons."

 Federal Rule of Civil Procedure 23(c)(5) states that "[w]hen appropriate, a class action may be divided into subclasses that are each treated as a class under this rule." An advisory committee note for Rule 23(c) indicates that subclasses are appropriate "[w]here a class is found to include subclasses divergent in interest." Accordingly, "[a] district court hearing a class action has the discretion to divide the class into subclasses and certify each subclass separately." *In re Cendant Corp. Sec. Litig.*, 404 F.3d 173, 202 (3d Cir.2005). We have explained that the option to utilize subclasses "is designed to prevent conflicts of interest in class representation." *Id.* Nonetheless, "[w]hile subclasses can be useful in preventing conflicts of interest, they have their drawbacks." *Id.* (citing a secondary source for the proposition that subclassing can create a "Balkanization" of the class action and present a huge obstacle to settlement if each subclass has an incentive to hold out for more money). Because "the decision whether to certify a subclass requires a balancing of costs and benefits that can best be performed by a district judge," we accord substantial deference to district courts with respect to their resolution of this issue. *Id.; see Alexander v. Gino's, Inc.*, 621 F.2d 71, 75 (3d Cir.1980) (noting that "the district court has considerable discretion in utilizing subclasses" under Rule 23(c)). Thus, "[w]here the district court has declined to certify a subclass, we will ordinarily defer to its decision unless it constituted an abuse of discretion." *In re Cendant Corp. Sec. Litig.*, 404 F.3d at 202; *cf. In re Prudential Ins. Co.*, 148 F.3d at 316 (explaining that the objector had "not demonstrated that [one type of] claimants differ from other class members so as to require the creation of a subclass," and concluding that "[b]ecause the [one type of] claimants did not require specialized or distinct treat-

ment, the court's failure to create a separate subclass for those claimants … was not an abuse of discretion").

 Under the circumstances of this case, we cannot say that the District Court abused its discretion in refusing to create subclasses or require separate representation. We acknowledge that the objectors' argument that subclasses should have been utilized has some appeal to it, given that the Plan of Allocation divides the total settlement award on the basis of the type of insurance, thereby creating different groups for the purpose of reimbursement, and the groups do not have access to an equal percentage of the fund. But subclasses are only necessary when members of the class have divergent interests and the District Court found that no such divergent interests existed between the allocation groups. The District Court explained that the objectors

> "failed to raise, let alone describe, *any* divergent or antagonistic interests between the three groups, as is required in order for subclasses to be mandated. Instead, [the objectors] state[ ] without explanation that these groups have 'claims of varying merit'—a statement that appears to have been derived entirely from the fact that the Settlement's plan of allocation has chosen to distribute different percentages of the settlement monies to these groups."

Zurich Settlement Final Approval Opinion at *18 (citation omitted). The District Court reasoned that simply because the relief varied among the different groups of class members did not demonstrate that there were conflicting or antagonistic interests within the class. The District Court's analysis of the adequacy of representation requirement of Rule 23(a) provides additional support for its conclusion that there are no divergent interests among the class members. In this context, the District Court found that

> "it is clear that the named Plaintiffs' interests are not antagonistic to those of the absent class members. The central questions in this case regarding the Zurich Defendants' alleged conduct, and the impact of that conduct on both the named Plaintiffs and the absent class members, animates in an identical fashion the claims of both groups. … Plaintiffs have advocated as vigorously for the absent class members as they have for themselves."

*Id.* at *15.

Moreover, on appeal, the objectors still fail to articulate how the interests of the various members are divergent, and instead they continue to point to the fact that the fund was allocated in such a way that a greater percentage of the settlement value is designated for class members who purchased excess insurance during certain years. However, this is simply a reflection of the extent of the injury that certain class members incurred and does not clearly suggest that the class members had antagonistic interests. Additionally, as the attorneys general emphasized at oral argument, many of the Settlement Class Members are *both* Excess and Non-Excess policyholders and will be entitled to recover damages for overpayment of premiums for both types of insurance. This illustrates that the Plan of Allocation did not create de facto subclasses among the class members but merely created a structure for ensuring that reimbursement is tied to the extent of damages incurred on certain policies of insurance. This method for distributing the fund, in which individuals and entities may have claims that span several of the allocation groups, did not produce a divergence of interests among the class members. Rather, regardless of the type of insurance at issue

and the time period during which it was purchased, all of the class members shared a unified interest in establishing the Zurich Defendants' liability for engaging in anticompetitive conduct which increased the cost of premiums for all policyholders.

Additionally, the District Court found that the Zurich Settlement Agreement and the Plan of Allocation were fair, reasonable, and adequate, and in support of this finding credited the representation of the attorneys general that the Plan of Allocation "accurately reflects differences in the impact of the Defendants' conduct in certain lines of insurance during different years." *Id.* at *11. As the plaintiffs explained in their memorandum in support of their motion for final approval of the settlement,

> "[f]or each group of claimants, the distributable amount from the Combined Settlement Amount will be calculated by dividing the premium paid by each claimant for the applicable policies by the total premiums paid by all claimants.... With respect to any Settlement Class Policy Purchase, no Conspiracy Claimant can recover a higher percentage of the premium paid than that recovered by an Excess Claimant or a Non–Excess Claimant. In addition, to the extent that any of the Combined Settlement Amount allocable to the Conspiracy Claimants is not distributed, that remaining amount shall be reallocated to the Excess Claimants and the Non–Excess Claimants, with 62.7% allocated to the Excess Claimants, and 37.3% allocated to the Non–Excess Claimants."

(Zurich App. 2906.) This information further demonstrates that the Plan of Allocation was carefully devised to ensure a fair distribution of the settlement fund to the various types of claimants and was allocated in such a way that policyholders who

likely incurred the most damage are entitled to a larger proportion of the recovery than those whose injuries were less severe. Even if some potential benefits may have been realized from utilizing subclasses, it is not at all clear that the advantages would have outweighed the disadvantages, and therefore it is difficult to say that the District Court abused its discretion by not taking this step. Consequently, we conclude that the District Court's decision not to certify separate subclasses or require separate representation did not constitute an abuse of discretion and likewise its approval of the Zurich Settlement Agreement and Plan of Allocation was also within its discretion.

### C. Challenges to the Approval of the Gallagher Settlement

#### 1. The District Court's Analysis

In the Gallagher Settlement, the District Court utilized the same approach it used in approving the Zurich Settlement with respect to the Rule 23 requirements for approving class action settlements. The District Court addressed the prerequisites of Rule 23(a) and concluded that the existence of over 288,000 potential class members "easily satisfies the numerosity requirement [of subsection (a)(1) ], as numbers in excess of forty, particularly those exceeding one hundred or one thousand have sustained the requirement"; the commonality requirement of subsection (a)(2) was "clearly satisfied" because of the "many common questions of law and fact"; the typicality requirement of subsection (a)(3) was met because "the claims made by named Plaintiffs and those made on behalf of the Settlement Class Members are indistinguishable, encompassing identical allegations" and such claims arose "in each case from the same course of action taken by the Gallagher Defendants"; and the adequacy of representation require-

ment of subsection (a)(4) was met because Class Counsel were "clearly well qualified and experienced class action attorneys who have been involved in similar . . . litigation around the country," and because "it is clear that the named Plaintiffs' interests are not antagonistic to those of the absent class members." Gallagher Settlement Final Approval Opinion at *9–11 (internal quotation marks omitted).

With respect to Rule 23(b)(3), the District Court concluded that the predominance requirement was met because "the identical claims of both the named Plaintiffs and the absent class members arise from the same set of facts regarding the alleged collusive and anticompetitive behavior of the Gallagher Defendants." *Id.* at *12. The District Court also determined that the superiority requirement of Rule 23(b)(3) was satisfied by the class action in light of the presence of more than 288,000 potential class members and millions of pages of documents, which, according to the District Court, made it "more desirable" to litigate these claims in one action, rather than in "numerous, separate actions litigating the same issue." *Id.* at *13.

The District Court also concluded that the Settlement Agreement satisfied Rule 23(e) because the agreement was fair, reasonable, and adequate. The District Court

reached this conclusion after analyzing each of the *Girsh* factors and determining that the first five factors "overwhelmingly weigh in favor of approval of settlement" and the final four factors "weigh slightly or moderately in favor of approval." *Id.* at *4.[29] Prior to certifying the class and approving the Gallagher Settlement Agreement, the District Court addressed and rejected the challenges raised by the two objectors.

### 2. Van Enterprises' Arguments on Appeal

As previously mentioned, Van Enterprises is the only objector-appellant with respect to the Gallagher Settlement. Van Enterprises presents nearly identical challenges to the District Court's approval of the Gallagher Settlement as it did with respect to the Zurich Settlement, arguing that the named plaintiffs lack standing, the Settlement Class is overbroad and the certification requirements of Rule 23(a) and (b)(3) were not satisfied, and the Plan of Allocation is not fair.

### a. Challenges to the Plaintiffs' Standing

Unlike the Zurich Settlement, Van Enterprises did object in writing to the Gallagher Settlement on the basis of the named plaintiffs' lack of standing, and therefore

---

**29.** The supplemental *Prudential* factors relevant here also weigh in favor of the Gallagher Settlement. *See supra* note 17 (quoting *In re Prudential Ins. Co.*, 148 F.3d at 323) (noting factors that may be appropriate to consider in addition to the ones enumerated in *Girsh*). Prior to the settlement, "[c]ounsel for the Plaintiffs obtained approximately 70 million pages of documents from various defendants and third parties, including roughly 1.4 million pages of documents and volumes of data from the Gallagher defendants alone. During this period, Plaintiffs' counsel also met and conferred with defense counsel numerous times and conducted approximately 181 depo-

sitions in connection with the action." Gallagher Settlement Final Approval Opinion at *2 (citation omitted). Accordingly, counsel had an extensive opportunity to assess the merits of the case. In addition, class members had a right to opt out, and some did so. *See id.* at *5. The objectors do not dispute the fairness of the award of attorneys' fees on appeal, but the District Court approved it as fair and reasonable, and we find no reason to doubt its judgment. Nor do we see cause to dispute the fairness of the claims-processing procedure. *See id.* at *15 (rejecting objections to the proposed claim form).

these arguments were considered by the District Court. The District Court found that "[t]he named Plaintiffs here have sufficiently alleged injury in fact—artificially inflated insurance premiums—as a result of the Gallagher Defendants' participation in the alleged customer allocation scheme and other alleged conduct," and that, as a result, "unnamed Plaintiffs in the class need not make a separate showing of injury in fact, and standing is not an obstacle to certification for the class for settlement purposes." *Id.* at *14.

Van Enterprises contends that "the named plaintiffs do not allege and have not shown that any of their policies were subject to the improper use of contingent commission agreements" and that "[n]one of the named plaintiffs claim that the receipt of contingent commissions caused any broker to steer them to a policy that cost more than it should have." Van Enterprises argues that, at best, the plaintiffs assert that they have standing because "the Insurer Defendants 'passed through' their payments of contingent commission to all of their insureds, regardless of the geographic area or the line of commercial insurance" and that this amounts to a non-particularized and conjectural allegation of injury.

The defendants respond that Van Enterprises' arguments are unavailing because "three different named class members purchased insurance coverage through Gallagher that included policies issued by Defendant Insurers who had entered into contingent commission agreements with Gallagher," and "these named plaintiffs were individually harmed by the existence of undisclosed contingent commissions." The plaintiffs add that "because the Settlement Class is limited to those policyholders with a 'direct and immediate relationship' to a Broker Defendant co-conspirator in this Action, and because all Settlement Class Members purchased insurance at prices elevated by Defendants' unlawful scheme, all members of the Settlement Class have standing and have been injured by the anticompetitive conduct described in the Complaints." The plaintiffs also contend that they "have suffered immediate concrete economic harm—an out-of-pocket cost—at the point they purchased their insurance policies through the Broker Defendants."

■ Because the plaintiffs alleged that several of the named plaintiffs utilized the Gallagher Defendants' brokerage services in order to obtain insurance and that the plaintiffs suffered economic harm in the form of higher premiums as a result of the defendants' anticompetitive conduct, the named plaintiffs have standing for purposes of the class certification. The allegations demonstrate that the named plaintiffs suffered an injury in fact that is concrete and particularized and which was proximately caused by the actions of the Gallagher Defendants, and this is sufficient to establish their standing. We do not need to assess the merits of the plaintiffs' argument that, having purchased insurance at higher prices, all of the class members have standing, because the critical question is whether the named plaintiffs who were actually before the District Court had standing irrespective of whether each absent class member could establish standing. The named plaintiffs only needed to allege that they suffered an injury in fact and were not required to prove the merits of their case against the Gallagher Defendants to establish standing. Accordingly, we conclude that the District Court correctly determined that the named plaintiffs had standing and that the case could proceed.

### b. Challenges to Class Certification

Van Enterprises' challenges to the certification of the Gallagher Settlement Class

mimic its challenges to the certification of the Zurich Settlement Class. In general terms, Van Enterprises argues: "A review of the pleadings, RICO statement, orders of dismissal and arguments and evidence submitted by the Settling Parties in favor of certifying this Settlement Class make clear that this incredibly broad Settlement Class does not meet the requirements of Rule 23." More specifically, Van Enterprises contends that the predominance requirement of Rule 23(b)(3) was not met because "common questions did not predominate for the antitrust claims" and "antitrust impact or injury could not be shown with common proof." As for the RICO claims, Van Enterprises argues the predominance requirement is not met because "there were not standard, uniform misrepresentations to the class" and it was questionable "whether any violation of RICO caused loss to the class." Van Enterprises also argues that the District Court, by "appl[ying] the commonality standard of [Rule] 23(a)(2) to determine whether questions of law or fact common to the members of the class predominate over any questions affecting only individual members," used the incorrect legal standard in making its Rule 23(b)(3) determination. As these challenges were preserved in Van Enterprises' written objection, we will consider each of them in turn.

 Although Van Enterprises' arguments are primarily focused on the predominance requirement of Rule 23(b)(3), we will briefly address the commonality and typicality requirements of Rule 23(a) as it specifically challenged these requirements in its written objection. The District Court found that the commonality requirement was satisfied because "there are many common questions of law and fact," listing, among others, questions such as whether "the Gallagher Defendants entered into a contract, combination or conspiracy to allocate the market for sale of insurance" and whether "the Gallagher Defendants engaged in a pattern of racketeering activity." Gallagher Settlement Final Approval Opinion at *10. Because the commonality requirement is "satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class," *Newton,* 259 F.3d at 183 (internal quotation marks omitted), we do not discern any error in the District Court's finding that the commonality requirement was satisfied. As for the typicality requirement, the District Court found that

"the claims made by named Plaintiffs and those made on behalf of the Settlement Class Members are indistinguishable, encompassing identical allegations that the Gallagher Defendants violated RICO, federal and state antitrust laws, and the common law obligations. These claims arise in each case from the same course of action taken by the Gallagher Defendants. Consequently, the named Plaintiffs' claims are typical of those brought by the Settlement Class Members at large."

Gallagher Settlement Final Approval Opinion at *11. We agree with the District Court that the claims of the named plaintiffs and the class members stem from the conduct of the Gallagher Defendants and that the interests of the named plaintiffs are sufficiently aligned with the interests of the entire class such that the typicality requirement is satisfied. Accordingly, we discern no error in the District Court's finding on this Rule 23(a) requirement of class certification.

Turning to Van Enterprises' challenge to the predominance requirement of Rule 23(b)(3), the District Court provided a nearly verbatim analysis of this element in its Gallagher Settlement opinion as it did in its Zurich Settlement opinion. The Dis-

trict Court noted that in order to satisfy this element of Rule 23(b)(3) "parties must do more than merely demonstrate a 'common interest in a fair compromise'; instead, they must provide evidence that the proposed class is 'sufficiently cohesive to warrant adjudication by representation.'" *Id.* at *12 (quoting *Amchem,* 521 U.S. at 623, 117 S.Ct. 2231). The District Court referred back to its Rule 23(a) commonality analysis in which it identified the following issues as being common to the class:

> "whether: (1) the Gallagher Defendants entered into a contract, combination or conspiracy to allocate the market for sale of insurance; (2) the Gallagher Defendants' contract, combination or conspiracy had the purpose and effect of reducing and unreasonably restraining competition in the sale of insurance; (3) the Gallagher Defendants' conduct violated § 1 of the Sherman Act; (4) the Gallagher Defendants engaged in a pattern of racketeering activity; and (5) the Gallagher Defendants violated RICO."

*Id.* at *10.

However, one notable difference between the District Court's analysis of predominance in the Gallagher Settlement in contrast to its discussion of this requirement in the Zurich Settlement is that the District Court was able to specifically address Van Enterprises' challenge to the predominance requirement because Van Enterprises had provided a more thorough explanation of its objection in its written submission to the District Court. Thus the District Court noted that Van Enterprises objected to the following: "[W]hether any antitrust injury is common to the class; whether Plaintiffs can show a uniform fraudulent representation sufficient to certify a RICO class; and whether common unjust enrichment issues predominate throughout the class." *Id.* at *14. Notwithstanding the reasons for Van Enter-

prises' objection, the District court determined: "[N]amed Plaintiffs and absent class members are asserting identical claims that arise from the same set of facts regarding collusive and anticompetitive behavior of the Gallagher Defendants. Consistent with the law of the Third Circuit, this satisfies the commonality requirement of [Rule] 23(a)." *Id.*

While we acknowledge that the District Court was imprecise when it referred to Rule 23(a) at this point of its analysis, as opposed to Rule 23(b)(3), it is clear from the entirety of the District Court's discussion that it was assessing whether the predominance component of Rule 23(b)(3) was satisfied. Similarly, at another point in its discussion, the District Court referred to "the commonality requirement of [Rule] 23(b)(3)" as opposed to the predominance requirement of Rule 23(b)(3). *Id.* Although it is appropriate to consider the commonality requirement of Rule 23(a) together with the predominance requirement of Rule 23(b)(3), *see In re Warfarin Sodium Antitrust Litig.,* 391 F.3d at 528, district courts must take care not to conflate the terminology because doing so results in confusion and may undermine the district court's conclusions.

■■■ Therefore, to ensure that the predominance requirement of Rule 23(b)(3) was satisfied, we will briefly analyze whether common questions of law and fact predominate over individual ones with respect to the plaintiffs' federal antitrust and RICO claims. As we discussed in the context of the Zurich Settlement, because the first and third elements of a Sherman Act violation focus on the conduct of the defendants, it is not difficult to identify common questions relevant to establishing these elements, such as whether the Gallagher Defendants agreed with any of the Insurer Defendants to steer customers to those insurers in exchange for the pay-

ment of contingent commissions, whether the Gallagher Defendants conspired with any Insurer Defendants to reduce competition in the insurance market by soliciting non-competitive bids, whether the Gallagher Defendants agreed with other Broker Defendants to share their contingent commission arrangements with each other but not to disclose these arrangements to their customers, whether the Gallagher Defendants actually engaged in collusive actions with other Broker Defendants as opposed to merely taking unilateral actions in their own best interest, whether any of the Gallagher Defendants' agreements constituted horizontal restraints of trade, and whether the Gallagher Defendants succeeded at allocating their business among a select group of insurers in restraint of trade. Common questions that are relevant to the second element of a Sherman Act violation include whether the Gallagher Defendants' actions reduced competition for insurance, whether the Gallagher Defendants' actions resulted in an allocation of customers and a consolidation of the insurance market, and whether the Gallagher Defendants' actions caused an increase in the cost of premiums for insurance. As for the fourth element, we likewise conclude that there are common questions relevant to proving antitrust injury. The plaintiffs alleged that premiums throughout the insurance industry were artificially inflated as a result of the contingent commission agreements and other allegedly anticompetitive practices that the Gallagher Defendants engaged in. Based on this theory, antitrust injury is susceptible to proof on a class-wide basis and involves common questions.

■ Turning to the plaintiffs' RICO claim, many of the same common questions that we identified in the context of the Zurich Settlement are also relevant here. The first element of a RICO violation in-

volves the common question of whether the Gallagher Defendants participated or engaged in conduct with other Insurer Defendants and Broker Defendants. The second element, whether an enterprise existed, also involves common questions of law and fact, such as whether the Broker Defendants and Insurer Defendants were part of an association in fact or whether they formed an enterprise through the legally recognized Counsel of Insurance Agents and Brokers. Similarly, the third and fourth elements involve common questions of law and fact as well, including whether the enterprise was being used to commit mail or wire fraud, or other acts that constitute racketeering, and whether such activities occurred often enough to establish a pattern. Again, we recognize that establishing liability under RICO also requires demonstrating that the plaintiffs suffered an injury to their property or business, which may require individual proof in some cases, but in this case the plaintiffs' "premium buildup" theory lends itself to proof on a class-wide basis. In sum, we conclude that, because the essential elements of the plaintiffs' federal claims involve common questions of law and fact, such common questions predominate over any individual ones, and Rule 23(b)(3) is satisfied.

### c. Challenges to the Plan of Allocation

Van Enterprises also contends that separate subclasses should have been certified to ensure adequate representation and a fair allocation of the settlement. Van Enterprises argues that the six categories of claimants among whom the settlement fund is allocated are subject to disparate treatment and that antagonistic interests exist between these groups. As an initial matter, we note that Van Enterprises made only a passing reference to the use of subclasses in its written objec-

tion to the Gallagher Settlement, which falls far short of the "sufficient specificity" standard of presenting an issue for consideration before the District Court in order to preserve it for appeal. *Keenan*, 983 F.2d at 471; *accord Shell Petroleum*, 182 F.3d at 218. Van Enterprises also failed to substantiate its argument that the Plan of Allocation was unfair, other than to state that "there is significant disparate treatment" of the six claimant groups. Nonetheless, to the extent that Van Enterprises' arguments contest the adequacy of representation—a challenge which it did preserve in its written objection—we will consider all of these arguments on appeal.

The District Court found that Van Enterprises' challenge to the Plan of Allocation was actually a challenge to the certification of the class because Van Enterprises' arguments related to the adequacy of representation as opposed to the fairness of the amounts of the fund that were allotted to each group of claimants. *See* Gallagher Settlement Final Approval Opinion at *9. We agree with the District Court that Van Enterprises did not raise any substantive challenges to the Plan of Allocation, nor does it articulate any such challenge on appeal. Accordingly, we find no error in the District Court's conclusion that the Settlement Agreement and the Plan of Allocation satisfied the requirements of Rule 23(e).

Addressing Van Enterprises' challenges in the context of the adequacy of representation requirement of Rule 23(a), the District Court found that there were not any antagonistic interests among the Class Members. Specifically, the District Court determined:

"Here, it is clear that the named Plaintiffs' interests are not antagonistic to those of the absent class members. The central questions in this case regarding the Gallagher Defendants' alleged conduct, and the impact of that conduct on both the named Plaintiffs and the absent class members, animates in an identical fashion the claims of both groups. [I]n addressing these common questions, the named Plaintiffs have advocated as vigorously for the absent class members as they have for themselves."

*Id.* at *11. The District Court found that the named plaintiffs did not have any divergent or conflicting interests with the absent class members and were therefore adequate representatives of the class, and we discern no error in this finding. Moreover, in the absence of divergent interests among the class members, we conclude that the District Court did not abuse its discretion by choosing not to utilize subclasses.

## D. Challenge to the Attorneys' Fees in the Zurich Settlement

### 1. Standards for Approving Attorneys' Fees

Requests for awards of attorneys' fees in a class action settlement may be presented as either a percentage of the total recovery of a common fund or as a dollar amount that is not derivative of the settlement value. When a percentage of the total recovery of the settlement is requested, we have articulated several factors that a district court should consider for assessing the reasonableness of the fee. *See Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190 (3d Cir.2000). The *Gunter* factors are as follows:

"(1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the

risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases."

*Id.* at 195 n. 1. These factors "need not be applied in a formulaic way ... and in certain cases, one factor may outweigh the rest." *Id.* We have instructed district courts that they are "to engage in robust assessments of the fee award reasonableness factors when evaluating a fee request." *In re Rite Aid Corp. Sec. Litig.,* 396 F.3d 294, 302 (3d Cir.2005).

The alternative to requesting a percentage of the total recovery is to request a particular dollar amount in connection with class counsel's lodestar.

"The lodestar award is calculated by multiplying the number of hours reasonably worked on a client's case by a reasonable hourly billing rate for such services based on the given geographical area, the nature of the services provided, and the experience of the attorneys. The multiplier is a device that attempts to account for the contingent nature or risk involved in a particular case and the quality of the attorneys' work."

*Id.* at 305–06 (footnote omitted). The reasonableness of the requested fee can be assessed by calculating the lodestar multiplier, which is equal to the proposed fee award divided by the lodestar (i.e., the product of the total hours and the blended billing rate). But the lodestar "multiplier need not fall within any pre-defined range, provided that the District Court's analysis justifies the award." *Id.* at 307.

"The percentage-of-recovery method is generally favored in common fund cases because it allows courts to award fees from the fund 'in a manner that rewards counsel for success and penalizes it for failure.' " *Id.* at 300 (quoting *In re Prudential Ins. Co.,* 148 F.3d at 333). "The lodestar method is more typically applied in statutory fee-shifting cases," but "[r]egardless of the method chosen, we have suggested it is sensible for a court to use a second method of fee approval to cross-check its initial fee calculation." *Id.* When the lodestar method is used only as a cross-check, it is appropriate to apply an abridged analysis, but courts should still "explain how the application of a multiplier is justified by the facts of a particular case." *In re Prudential Ins. Co.,* 148 F.3d at 340–41. "The lodestar cross-check serves the purpose of alerting the trial judge that when the multiplier is too great, the court should reconsider its calculation under the percentage-of-recovery method, with an eye toward reducing the award." *In re Rite Aid Corp. Sec. Litig.,* 396 F.3d at 306.

## 2. The District Court's Analysis

The District Court began its analysis by calculating the percentage of recovery that Class Counsel's fee request represented, analogizing the fee request to a common fund case. The District Court explained that according to Class Counsel, the $29,950,000 fee award was 23% of the minimum recovery attributable to their efforts or, alternatively, if expenses and incentive awards were subtracted from the total award, then the attorneys' fee would amount to 19.9% of the minimum recovery. *See* Zurich Settlement Attorneys' Fees Opinion at *2. Class Counsel claimed—and the District Court accepted for the purposes of this calculation—that they deserved credit for the $100,000,000 settlement fund established under the MOU and the $29,950,000 for fees and expenses, for a combined total of $129,950,000. *Id.* The District Court acknowledged that "this Settlement is not strictly a common fund," but reasoned that the appropriate analysis "is analogous to that performed to the common fund doctrine." *Id.* at *3.

The District Court proceeded to analyze each of the *Gunter* factors, at times applying some of the same reasoning it used in approving the Zurich Settlement Agreement under the *Girsh* factors. The District Court concluded that the first factor—the size of the fund created and the number of persons benefitted—weighed in favor of approval because "Class Counsel were able to obtain a sizeable result, $121,800,000, on behalf of the Class." *Id.* at \*4. The District Court also referenced the number of people who would benefit from the Settlement Agreement and the fact that the Settlement Agreement would not be reduced by awarding attorneys' fees and expenses. *Id.* The District Court determined that the second factor—the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel—weighed in favor of approval due to the "small number of objections ... [and the lack of] merits of those objections." *Id.* at \*6. The District Court relied on the same reasoning it used in its *Girsh* analysis to conclude that the third and fourth factors were satisfied—the skill and efficiency of the attorneys involved and the complexity and duration of the litigation. *See id.*

The District Court found that the fifth factor—the risk of non-payment—weighed in favor of approval because "Class Counsel invested a substantial amount of time and effort to reach this point and obtain the favorable Settlement" and "Class Counsel accepted the responsibility of prosecuting this class action on a contingent fee basis and without any guarantee of success or award." *Id.* at \*7. As for the sixth factor—the amount of time devoted to the case by plaintiffs' counsel—the District Court determined that it also weighed in favor of approval due to the large amount of time (200,000 hours prior to settlement), money (aggregate lodestar of nearly $74,000,000 and expenses of nearly

$4,000,000), and effort put forth by many firms (approximately fifty law firms). *See id.* Finally, the District Court determined that the award requested by Class Counsel (either 23% or 19.9%) was reasonable because it was on par with amounts previously awarded in similar settlement cases in the District of New Jersey and it was within the range of privately negotiated contingent fees for commercial litigation. *See id.* at \*7–8. Consequently, the District Court concluded that "the requested fee by Class Counsel is fair and reasonable according to the *Gunter* factors." *Id.* at \*8.

In addition to considering the percentage of recovery in the context of the *Gunter* factors, the District Court also performed a lodestar cross-check and calculated the lodestar multiplier by using Class Counsel's proposed fee award of $29,950,000, and dividing that number by the value of the lodestar that Class Counsel claimed for its work through July 31, 2006 (the approximate time when the Zurich Settlement Agreement was reached). *See id.* at \*9. The District Court accepted the total number of hours submitted by Class Counsel and explained that it "may rely on summaries submitted by the attorneys, and is not required to scrutinize every billing record." *Id.* The District Court also noted that "Class Counsel did not provide declarations in support of any particular hourly rate," but based on the District Court's own calculation (which it arrived at by dividing the total lodestar by the total hours worked), "[i]t appears that the hourly rate being used by Class Counsel is approximately $365." *Id.* at \*10. The District Court considered this rate reasonable based on Class Counsel's experience and the lack of objections to the rate. *Id.* The District Court's calculation produced a lodestar multiplier of 0.4,

which the District Court stated was "within an accepted range." *Id.* at *9.

Before concluding its analysis, the District Court also addressed the five objections raised to Class Counsel's fee request. First, the District Court rejected the claim that the value of Class Counsel to class members was lower due to the participation of several attorneys general, stating that "[b]ased on details of the Settlement Agreements, it does not appear that Class Counsel has run afoul of [the Third] Circuit's prohibition of collecting fees based on the work of governmental agencies." *Id.* at *5. Next, relying on *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), the District Court rejected the claim that Class Counsel was seeking to recover fees based on non-Zurich Settlement related issues, explaining that "there are situations where 'the plaintiff's claims for relief will involve a common core of facts or will be based on related legal theories' and that '[m]uch of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis.'" Zurich Settlement Attorneys' Fees Opinion at *5 (quoting *Hensley*, 461 U.S. at 435, 103 S.Ct. 1933). The District Court also rejected the objections that Class Counsel failed to perform their gatekeeper function and that the fees requested were too high, finding both objections "not persuasive." *Id.* at *6. The District Court finally rejected the objection that the $10,000 class representation fee was too high, stating that "the Objectors fail to put forth any authority to support this argument." *Id.* Relying on its *Gunter* analysis, which involved calculating the percentage of recovery, and its lodestar crosscheck, the District Court approved Class Counsel's requested attorneys' fees, reimbursement of expenditures, and incentive awards for named plaintiffs.

### 3. The Objectors' Challenges on Appeal

The Iaad/Zorkess objectors argue that the District Court abused its discretion when it awarded $29,950,000 in attorneys' fees and costs to Class Counsel because the District Court "overestimated the settlement funds created solely by Class Counsel, included time in Class Counsel's lodestar that was spent pursuing unsuccessful litigation, and failed to exclude from the lodestar calculation clearly excessive time submissions." In particular, these objectors argue that "Zurich class counsel can take credit for no more than $70 million of the overall settlement," because although the MOU secured $100,000,000 for a settlement fund, "class counsel were eventually forced to cede $29,900,000 to the Three–State Settlement in order to make the overall deal work." Moreover, they assert that because "57% of the Settlement Fund [goes] to the Excess Claimants represented by the various attorneys general . . . only 43% of the $70 million balance of the MOU monies, or $30 million, will be paid to the clients of the Zurich class counsel." Thus they argue that the attorneys' fees awarded to Class Counsel represent far too high a percentage of the total settlement value that Class Counsel's efforts secured.

With respect to the calculation of the lodestar, the Iaad/Zorkess objectors argue that "there is no justification for Class Counsel's inclusion of all of the time spent to date in this consolidated case in support of their requested fee in the settlement of only one small portion of the overall MDL litigation." Accordingly, these objectors contend that the District Court should not have allowed Class Counsel to "merely summarize[] the time and expenses of each of the 44 law firms that claimed to have performed work that contributed to the Zurich settlement." Additionally, they

argue that Class Counsel abused their gatekeeper function with respect to allocating work in such a way that promotes efficiency, and moreover that the "amount of time claimed by certain firms . . . raises the possibility of fraud."

In response, the plaintiffs argue that they executed the MOU with the Zurich Defendants "seven months before Zurich settled with the Attorneys General and other regulators," and that "it was a requirement under the MOU . . . that Zurich settle with the Attorneys General" and therefore Class Counsel played a critical role in the settlement. They also contend that "[t]he argument that Class Counsel can only recover for time spent on Zurich, moreover, ignores the reality that Class Counsel's efforts cannot be compartmentalized, as a number of their actions against all the Defendants provide a benefit to the Class and clearly had a bearing on the Zurich Defendants' interest in and willingness to settle." With respect to the objectors' time calculation challenge, the plaintiffs argue that "even if one assumed there was some duplication," the award was not excessive because it was "a fraction of Class Counsel's total lodestar." In sum, the plaintiffs argue that "since the requested fee amount is no more than a fraction of the total lodestar to date, and the requested fee and expense award is not being paid out of the common settlement fund, there is especially little risk here that firms will somehow benefit from inefficient billing practices, or that the Class will in any way be harmed by the requested award."

The Zurich Defendants do not take a position as to the reasonableness of the attorneys' fees; however, they do point out that under the terms of the Zurich Settlement Agreement, "if the Fees and Expenses award is reduced, as the Objectors seek, Class Counsel must reimburse the Zurich Defendants that amount, with interest." The intervenor attorneys general also take no position relating to the payment of attorneys' fees.

■ We believe that it was appropriate for the District Court to evaluate the reasonableness of the fee award under a percentage of recovery method even though the Zurich Settlement is not a typical common fund. In order to test the reasonableness of the fee under this method, the District Court needed to determine what amount of the total settlement value could be attributed to the work of Class Counsel. Although at one point the District Court refers to Class Counsel achieving a sizeable result of $121,800,000 for the settlement fund, it is clear from the remainder of the District Court's analysis that it was crediting Class Counsel with achieving $129,950,000 of the Settlement Fund based on the $100,000,000 secured under the MOU and the $29,950,000 secured under the separate fee agreement.

It was reasonable to include the $29,950,000 amount in the calculation of the settlement value created by Class Counsel in order to determine the percentage of the total recovery that the fee constitutes because in the typical common fund case, class counsel would be awarded a percentage of the fund and the balance would be available for the class members (e.g., defendants agree to pay $100,000,000 to a common fund, but class counsel is awarded 25% of the settlement value, leaving only $75,000,000 for the class). Here, it is possible to view the agreement reached between the Zurich Defendants and the plaintiffs (absent the amount that was contributed to the settlement fund pursuant to the Multi–State Agreement negotiated by the attorneys general) as totaling $129,950,000 with a 23% fee award. This is why Class Counsel asserts that their fee request amounts to 23% of

the settlement value for which they were responsible (or 19.9%, once expenses and incentive awards are subtracted from the total fee award).

█ The objectors make a colorable argument that Class Counsel should not be allowed to take credit for the entire $100,000,000 as set forth in the MOU because, under the terms of the Settlement Agreement, the Zurich Defendants were allowed to reduce the total amount that they contributed to the class settlement fund by $29,900,000 based on the separate fund that they were creating pursuant to the Three–State Agreement. If Class Counsel can only take credit for $70,000,000 of the value of the Zurich settlement fund, then the percentage-of-recovery which Class Counsel requested is much larger. Rather than asking for approximately $30,000,000 out of $130,000,000, Class Counsel's request would amount to about $30,000,000 out of $100,000,000, or 30% of the fund. Nonetheless, we do not believe that the District Court abused its discretion by crediting Class Counsel with achieving the entire $100,000,000 as provided for in the MOU, because even though nearly $30,000,000 of this amount was separately earmarked for distribution through the Three–State Agreement, the money still benefitted potential Settlement Class Members in that everyone who chose to claim under the Three–State Agreement otherwise would have been eligible to claim under the Zurich Settlement Agreement. We agree with the District Court that Class Counsel's efforts produced at least $100,000,000 for the Settlement Class in addition to the $29,950,000 separately designated for their fees.

█ Next we consider the District Court's lodestar analysis. Although the District Court was only utilizing the lodestar method as a cross-check of the rea-

sonableness of the fee request under the percentage-of-recovery method, it still needed to calculate the lodestar multiplier correctly in order for the cross-check to be meaningful. Initially, despite the objectors' arguments to the contrary, it was not error for the District Court to rely on time summaries instead of reviewing actual time records. See In re Rite Aid Corp. Sec. Litig., 396 F.3d at 306–07; In re Prudential Ins. Co., 148 F.3d at 342. Although Class Counsel did not disclose the billing rate they used to calculate their lodestar, the District Court had enough information to conclude that the blended billing rate was approximately $365, and the District Court considered this a "reasonable hourly billing rate for such services based on the given geographical area, the nature of the services provided, and the experience of the attorneys." Zurich Settlement Attorneys' Fees Opinion at *8 (internal quotation marks omitted). We have no reason to believe this finding was in error and, because the District Court was in the best position to make this assessment, we defer to its reasonable judgment.

█ The lodestar multiplier that the District Court calculated was less than one and thus reveals that Class Counsel's fee request constitutes only a fraction of the work that they billed in conjunction with the Zurich Settlement Agreement. Even assuming there was some inflation of the hours billed in relation to the Zurich Settlement or some duplicative work involved in the total hours count, a significant adjustment would have to be made to the hours calculation before the lodestar multiplier (here, a fraction) would even begin to approach one. While district courts must be aware of the potential for manipulation of the lodestar and lodestar multiplier, we are satisfied that in the present case the District Court's lodestar cross-check con-

firmed the reasonableness of the fee request. Additionally, the District Court's analysis of the *Gunter* factors was well-reasoned and thorough and therefore further supports the conclusion that the District Court's award of fees was not an abuse of discretion.

### IV. Conclusion

For the reasons set forth above, we will affirm the orders of the District Court granting final approval of the Zurich Settlement and the Gallagher Settlement and approving the motion for an award of attorneys' fees in the Zurich Settlement.