**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-4415
_____

IN RE: CARIBBEAN PETROLEUM CORP., ET AL.,
Debtors


INTERTEK USA, INC.,
Appellant

v.

CARIBBEAN PETROLEUM CORP; FTI CONSULTING, INC.,
as Liquidation Trustee of Caribbean Petroleum Liquidation Trust
_____

On Appeal from the United States District Court
for the District of Delaware
(D.C. Civil Action Nos. 13-cv-00466/13-cv-00717/
13-cv-00732/13-cv-00733)
District Judge:  Honorable Leonard P. Stark
_____

Submitted under Third Circuit LAR 34.1(a)
September 8, 2014

Before:  RENDELL, GREENAWAY, JR. and KRAUSE, *Circuit Judges.*


(Opinion filed: September 18, 2014)

_____

O P I N I O N

_____

KRAUSE, *Circuit Judge*.

The central issue in this appeal by Intertek USA, Inc. ("Intertek") is whether the plain language of two orders of the Bankruptcy Court gives priority to tort claimants above other general unsecured creditors in the distribution of certain insurance proceeds in the bankruptcy of Caribbean Petroleum Corporation. Intertek contends that, because Puerto Rican law gives tort claimants the right to file a direct action against the insurer, and because one of the Bankruptcy Court's orders indicated that their claims would "survive" and be "channeled" to the proceeds of the policies, the tort claimants are entitled to be paid first from those proceeds, before other unsecured creditors. Because this argument comes too late, and because we agree with the District Court that the orders in question unambiguously provide for *pro rata* distribution to all holders of general unsecured claims, including tort claims, we affirm.

I.      Facts and Procedural History

Because we write primarily for the parties, we set forth only those facts and procedural history relevant to our conclusion.

A.      The Debtors and the Event Causing Insolvency

Caribbean Petroleum Corporation, Caribbean Petroleum Refining, L.P., and Gulf Petroleum Refining (Puerto Rico) Corporation (collectively "the Debtors") operated a petroleum refinery business based in Bayamón, Puerto Rico. In October 2009, a massive explosion occurred at the Bayamón facility. Class action complaints were filed against

2

the Debtors soon thereafter, with approximately 4,000 claimants seeking up to $500 million in damages. Intertek, as an alleged joint tortfeasor, was named as a co-defendant with the Debtors in some of those tort actions and brought claims for contribution and indemnity against the Debtors. Because Puerto Rico provides tort victims a statutory right of direct action against the insured's carrier, Chartis Insurance Company ("Chartis"), which had issued both general liability and umbrella liability insurance policies to the Debtors (the "Chartis Policies"), was named as a co-defendant in certain actions.

The explosion and resultant lawsuits forced the Debtors to file for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1101 *et seq*. In those proceedings, the Debtors, along with the Unsecured Creditors' Committee and Banco Popular de Puerto Rico ("BPPR"), entered into a settlement (the "BPPR Settlement") that contemplated a plan-based allocation of BPPR's collateral to fund distributions to the holders of administrative expense claims, priority claims, and general unsecured claims. As part of that settlement, the Debtors also filed a proposed liquidation plan that was eventually confirmed as amended (the "Plan"), and BPPR agreed to allocate, pursuant to the Plan and Plan Supplement, the proceeds of any settlements concerning the Debtors' Liability Insurance Policies (defined to include the Chartis Policies) to fund distributions to the holders of general unsecured claims, including tort claims.

Pursuant to the Plan, Caribbean Petroleum Liquidation Trust was established, consisting of the Debtors' assets, and FTI Consulting, Inc. was appointed as liquidation trustee ("the Trustee").

B.     The Liability Insurance Proceeds

In the face of these mass tort claims, Chartis disputed the scope and extent of its obligations under the Chartis Policies. Thus, while negotiating the BPPR Settlement and as contemplated by the Plan, the Debtors also negotiated with Chartis a resolution of those disputes. Those efforts eventually led to a settlement in which Chartis agreed to buy back the Chartis Policies from the Debtors for $24 million (the "Chartis Proceeds"), which constituted all or nearly all of the remaining coverage under the Chartis Policies. The Debtors then filed a motion (the "Buyback Motion") seeking the Bankruptcy Court's approval for the Debtors to enter into that settlement.

According to the Buyback Motion, the proposed settlement would resolve the coverage disputes between Chartis and the Debtors, would "guarantee[] the payment of approximately $24 million to the Debtors' estates," J.A. 341, would "fund distributions to the holders of allowed general unsecured claims, including Tort Claims,"[1] subject to the

_____

[1] "Tort Claim" is defined in the Plan to mean:

(a) any Claim asserted against any of the Debtors that is predicated upon alleged damages incurred on account of negligence or other equivalent tort legal theory in connection with the explosions that occurred at Caribbean Petroleum Refining L.P.'s facilities in October 2009 or (b) any Claim asserted against any of the Debtors for contribution or indemnity related to

4

terms of the Plan, J.A. 332, and would permanently bar both pending and future claims under the Chartis Policies against Chartis itself. To accomplish these objectives, the order entered by the Bankruptcy Court that granted the Buyback Motion (the "Buyback Order") provided in paragraph 7 that "[a]ll claims and interests that were, could have been or may in the future be asserted under or against the Chartis Policies shall survive, and be channeled solely and exclusively to the proceeds of such sale as may be held by the Debtors or any Successor, which shall be distributed solely in accordance with the Plan or further order of the [Bankruptcy] Court." J.A. 1217.

On May 9, 2011, the same date it entered the Buyback Order, the Bankruptcy Court also entered an order confirming the Plan. Among other things, the Plan provided that holders of General Unsecured Claims, defined in a way to include Tort Claims, would receive a *pro rata* share of the Chartis Proceeds "to the extent that proceeds of the Liability Insurance Policies are received by the Debtors or the Liquidation Trust, as applicable, pursuant to a settlement with any of the insurers under any of the Liability Insurance Policies, and subject in all respects to Section 6.2(c)(iv) of the Plan with respect to the Chartis Liability Proceeds, the proceeds of the Liability Insurance Policies

---

the explosions that occurred at Caribbean Petroleum Refining L.P.'s facilities in October 2009.

J.A. 959.

received by the Debtors and the Liquidation Trustee, as applicable, pursuant to such settlement."[2]  J.A. 968-69.

Intertek was served with notice of the Buyback Motion and the Buyback Order, and with notice of the Plan and disclosure statement associated with the Plan, but filed no objections, did not seek to be heard at the relevant hearings and did not appeal or contest the orders themselves.  Accordingly, the Buyback Order became final on May 23, 2011, and the Plan took effect on June 3, 2011.

### C.    The Post-Confirmation Dispute

In October 2012, Intertek filed in the Bankruptcy Court the motion and adversary complaint that are the subject of this appeal.  Those filings purported not to attack the Buyback Order and Plan Confirmation Order, which, of course, had become final a year and a half earlier, but rather argued that those documents by their terms provided tort claimants with a priority interest over other unsecured general creditors in the Chartis Proceeds and therefore sought to "enforce" that interpretation of the Buyback Order and Plan.

The Bankruptcy Court denied the motion, finding that the Plan provided for the Chartis Proceeds to be distributed on a *pro rata* basis to all general unsecured creditors, and dismissed the adversary complaint on the stipulation of the parties.  On appeal, the

---

[2] Section 5.5(a) provides for deduction of costs and expenses in connection with the administration of distributions to the holders of Allowed General Unsecured Claims, including "the allowance and administration of General Unsecured Claims (including Tort Claims)."  J.A. 969.  Section 6.2(c)(iv) specifically designates the first $3.9 million

District Court affirmed those orders, rejecting certain newly-raised arguments as waived and concluding that Intertek's arguments constituted a time-barred collateral attack on the Plan itself, that the terms of the Buyback Order and Plan were unambiguous as to the rights of tort claimants, and that, even if there were ambiguity, the Bankruptcy Court's interpretation of those orders was not unreasonable. Intertek filed a timely notice of appeal.[3]

II.      Jurisdiction and Standard of Review

The District Court had jurisdiction pursuant to 28 U.S.C. § 158(a)(1). We have jurisdiction under 28 U.S.C. § 158(d) and 28 U.S.C. § 1291.

We review *de novo* whether a Bankruptcy Court's order is ambiguous. *In re Shenango Grp. Inc.*, 501 F.3d 338, 346 (3d Cir. 2007). Our review of an appeal from an order granting a motion to dismiss is plenary. *In re Pers. & Bus. Ins. Agency*, 334 F.3d 239, 242 (3d Cir. 2003).

A.      The Plain Meaning of the Bankruptcy Orders

We start from the unremarkable premise that "where the plain terms of a court order unambiguously apply, . . . they are entitled to their effect." *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 150 (2009); *accord Shenango*, 591 F.3d at 346. From there,

_____

of the Chartis Proceeds to be used to satisfy Allowed Administrative Expense Claims.

[3] Under separate filing, Intertek also appealed an order of the District Court that affirmed the Bankruptcy Court's disallowance of certain proofs of claim filed by Intertek. On May 6, 2014, we affirmed that order in a not precedential opinion. *In re Caribbean Petrol. Corp.*, C.A. No. 13-2326, --- F. App'x. ----, 2014 WL 1778050 (3d Cir. May 6, 2014) ("*In re Caribbean I*").

however, we must grapple with the remarkably different meaning ascribed by Intertek to the very same language found to be plain and unambiguous by both the District Court and Bankruptcy Court.

Intertek's argument appears to be that the language of the Buyback Order and Plan must be read against the backdrop of Puerto Rico's direct action statute, which gave tort victims, at the moment of the explosion, the right to bring claims directly against Chartis.[4] Given that right, according to Intertek, tort victims had a vested interest in Chartis' payment of loss even before the bankruptcy, and the statement in paragraph 7 of the Buyback Order—that claims that could have brought against the Chartis Policies "shall survive, and be channeled solely and exclusively to the proceeds of such sale as may be held by the Debtors or any Successor, which shall be distributed solely in accordance with the Plan or further order of the Court," J.A. 1217,—unambiguously endows tort claimants with an exclusive right to distribution of the Chartis Proceeds. Intertek posits that this language, consistent with the intent of the direct action statute, removes those proceeds from the bankruptcy estate, places them into a separate fund, and renders them unavailable for distribution to other general unsecured creditors under the Plan until the interests of Tort Claim holders have been satisfied.

---

[4] Puerto Rico's direct action statute provides that a tortfeasor's insurance carrier "shall become liable whenever a loss covered by the policy occurs, and payment of such loss by the insurer to the extent of its liability therefor under the policy shall not depend upon payment by the insured of or upon any final judgment against him arising out of such occurrence, nor shall it depend upon said judgment." 26 L.P.R.A. § 2001.

In an attempt to explain how this alleged "plain meaning" can be reconciled with the direction in paragraph 7 that the interests "be distributed solely in accordance with the Plan," and the language in section 5.5(a) of the Plan itself that appears on its face to provide for *pro rata* distribution of the Chartis Proceeds to all General Unsecured Creditors, Intertek observes that the *pro rata* distribution applies only "to the extent that proceeds of the Liability Insurance Policies are received by the Debtors or the Liquidation Trust, as applicable, pursuant to a settlement with any of the insurers under any of the Liability Insurance Policies." J.A. 968. Because, in Intertek's view, the settlement embodied in the Buyback Order unambiguously excludes the Chartis Proceeds from the estate and the Plan provides for *pro rata* distribution "as applicable, pursuant to [the] settlement," *id.*, the two documents read together can mean only that holders of Tort Claims have a priority right to the Chartis Proceeds and that only after full satisfaction of those interests (through an unspecified priority claims process for distribution of those proceeds from the Liquidation Trust) would any surplusage be distributed *pro rata* to non-tort General Unsecured Creditors.

We cannot accept this tortured reading of the relevant documents. Paragraph 7 of the Buyback Order provides by its plain terms that claims then pending or that could have been brought under the Chartis Policies were not extinguished by that order (which otherwise enjoined and barred all claims against the Chartis Policies or Chartis with respect to those policies) and that such claims shall be directed instead to the Chartis Proceeds, which shall be "distributed solely in accordance with the Plan or further order

9

of the Court." J.A. 1217. Section 5.5(a) of the Plan, in turn, states clearly and simply that all holders of General Unsecured Claims, including Tort Claims, are entitled to a *pro rata* distribution of the Chartis Proceeds, and is devoid of any language suggesting that holders of Tort Claims are entitled to different recovery than other members of the same class or are to be treated as a separate sub-class. Instead, the reference in that section to "proceeds . . . received by the Debtors or the Liquidation Trust, as applicable, pursuant to a settlement," J.A. 968, by its plain terms describes the anticipated source of those proceeds, including the settlement with Chartis that was approved in the Buyback Order on the same date the Plan was confirmed. If section 5.5(a) provides for priority distribution to Tort Claim holders, it would—like the $3.9 million expressly set aside from the Chartis Proceeds for administrative expenses—be referenced within the four corners of the Plan or explained by further order of the Bankruptcy Court. No such language exists and no such order was issued.

Moreover, language elsewhere in the relevant documents leaves no room for ambiguity as to the plain meaning of paragraph 7 and section 5.5(a). The Buyback Motion, for example, to which the Buyback Order specifically refers, states that the settlement "guarantee[s] the payment of approximately $24 million to the Debtors' estates," J.A. 341, not to a separate fund. The Buyback Order is in accord. J.A. 1217 ("Chartis shall pay to the Debtors . . . the Purchase Amount in accordance with the Agreement."). The Buyback Motion repeatedly confirms that once acquired by the Debtors, the Proceeds shall "provide a valuable and certain source of recovery for the

10

economic stakeholders in these chapter 11 cases – and in particular, the holders of allowed general unsecured claims." J.A. 329; *see also* J.A. 332 (noting that BPPR has agreed to allocate Liability Insurance Proceeds "to fund distributions to the holders of allowed general unsecured claims, including Tort Claims," subject to the terms of the Plan). According to Intertek, however, this "guarantee[d]" and "certain" source of recovery for general unsecured claims, J.A. 329, 341, should be understood as a "remainder interest" that, it concedes, "is unlikely to occur," Appellant's Br. 25. This is untenable and renders otherwise clear terms of the documents not only ambiguous, but meaningless.

In sum, while sharing liability insurance proceeds with other unsecured creditors may be unpalatable for Tort Claim holders and, if timely raised, arguably implicated public policy concerns in light of Puerto Rico's direct action statute, that is what the Buyback Order and Plan unambiguously provided. Nothing in either document remotely suggests otherwise, and Intertek failed to object to either in a timely manner. Consequently, the Bankruptcy Court properly carried out unambiguous orders according to their plain meaning. *See Shenango*, 501 F.3d 338 at 346.

             B.      Intertek's Arguments as to the Bankruptcy Court's Jurisdiction

Notwithstanding the plain language of the Buyback Order and Plan, Intertek asserts that the Bankruptcy Court's interpretation must be rejected as unreasonable because it would exceed the Bankruptcy Court's jurisdiction. Specifically, Intertek contends that, because tort claimants' right to the proceeds of the Chartis Policy vested

upon the occurrence of the loss under Puerto Rico's direct action statute, the Chartis Proceeds were never part of the estate and the Buyback Order and Plan cannot reasonably be interpreted to enable the Bankruptcy Court to reach non-debtor property. This argument does not change our conclusion.

First, we review a Bankruptcy Court's interpretation of its own order for abuse of discretion only where the language of that order is ambiguous. *Shenango,* 501 F.3d at 346. In this case, however, having conducted a *de novo* review and determined that the plain language of the relevant orders is unambiguous, we have no need to review the reasonableness of the Bankruptcy Court's interpretation. *Id.*

In any event, the time for Intertek to challenge the jurisdiction of the Bankruptcy Court over the Chartis Proceeds has long passed. Once a plan has been confirmed, a court will declare that a "judgment is void because of a jurisdictional defect . . . only for the exceptional case in which the court that rendered judgment lacked even an 'arguable basis' for jurisdiction." *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 271 (2010) (quoting *Nemaizer v. Baker*, 793 F.2d 58, 65 (2d Cir. 1986)); *see also Travelers Indem. Co.*, 557 U.S. at 153 ("So long as [claimants] or those in privity with them were parties to [the debtor's] bankruptcy proceeding, and were given a fair chance to challenge the Bankruptcy Court's subject-matter jurisdiction, they cannot challenge it now by resisting enforcement of the [Court's earlier] Orders."); *In re Lazy Days' RV Ctr. Inc.*, 724 F.3d 418, 422 (3d Cir. 2013) ("[W]e note that the question of whether the Bankruptcy Court had jurisdiction to confirm the reorganization plan that included the

12

Settlement Agreement in the first place is not before us, as no party challenged the Bankruptcy Court's jurisdiction over that proceeding.").

The Bankruptcy Court here had more than an arguable basis for jurisdiction. In our Circuit, "[i]t has long been the rule . . . that insurance policies are considered part of the property of a bankruptcy estate." *ACandS, Inc. v. Travelers Cas. & Sur. Co.*, 435 F.3d 252, 260 (3d Cir. 2006) (citing *Estate of Lellock v. Prudential Ins. Co. of Am.*, 811 F.2d 186, 189 (3d Cir. 1987)). With limited exceptions, so are the rights to insurance proceeds. *See In re Nutraquest, Inc.*, 434 F.3d 639, 647 n.4 (3d Cir. 2006) (citations omitted).[5] Accordingly, there is no reason for us to void the judgment on jurisdictional grounds. *See Espinosa*, 559 U.S. at 271.

If anything, Intertek's attack on the Bankruptcy Court's jurisdiction lays bare the illogic of its own position: Intertek's insistence that the Plan contemplates a separate, priority claims process for distribution of the Liquidation Trust to holders of Tort Claims assumes the Bankruptcy Court had jurisdiction to authorize such a process in the first

---

[5] Intertek argues for such an exception in the context of direct action statutes, citing to cases from the Fifth Circuit that address Louisiana's direct action statute and that hold liability insurance proceeds are not part of the bankruptcy estate. *See* Appellants' Br. at 24 (citing *In re Babcock & Wilcox. Co*, 69 F. App'x 659 (5th Cir. 2003) (per curiam); *Landry v. Exxon Pipeline Co.*, 260 B.R. 769, 800 (Bankr. M.D. La. 2001) (examining Louisiana's analogous direct action statute)). However, even within the context of Louisiana law, the Fifth Circuit has noted a general exception where, as here, "a mass tort action where hundreds or thousands of claims against the debtor's insurer might exhaust insurance proceeds and thus threaten the debtor's estate over and above limits of liability insurance policies." *Sosebee v. Steadfast Ins. Co*., 701 F.3d 1012, 1023 (5th Cir. 2012) (citing *MacArthur Co. v. Johns-Manville Corp*., 837 F.2d 89, 92 (2d Cir. 1988); *In re Edgeworth,* 993 F.2d 51, 55-56 (5th Cir. 1993)).

place. Instead, as the District Court observed, what Intertek is contesting at its core is the fairness to those Tort Claim holders of the Buyback Order and the Plan—a challenge that comes far too late.

### C. Remaining Arguments

We are unswayed by Intertek's remaining arguments. Contending that ambiguity in the Plan rendered notice deficient, Intertek alleges it was deprived of due process. Such an argument was already rejected once by our Court, *see In re Caribbean I*, 2014 WL 1778050 at *5, and our holding today reinforces that, even assuming the claim was not waived below, it is meritless: Intertek was served with the Buyback Motion, Buyback Order and Plan, which unambiguously announced the specifics of the distribution; it had ample opportunity to object and be heard; and it chose not to do so in the time-frame allotted. *See Espinosa*, 559 U.S. at 272 (holding that where claimant was served with "*actual* notice of the filing and contents of [a debtor's] plan," due process was "more than satisfied"); *Chemetron Corp. v. Jones*, 72 F.3d 341, 346 (3d Cir. 1995) ("Due process requires notice that is reasonably calculated to reach all interested parties, reasonably conveys all the required information, and permits a reasonable time for a response.") (internal quotation marks omitted).

Next, Intertek argues that dismissal of its adversary complaint was premature because, among other things, the Bankruptcy Court relied on extrinsic evidence—the Buyback Motion—in reaching its decision. This argument, too, is unpersuasive. The Bankruptcy Court dismissed Intertek's complaint on consent, based on Intertek's own

14

stipulation that "the legal holdings in the [Bankruptcy Court's] Memorandum Opinion are dispositive of Intertek's claims in the Intertek Complaint." Stip. Regarding Dismissal of Intertek USA, Inc.'s Compl., J.A. at 6429. Intertek can hardly now object to the dismissal it procured as premature. Regardless, it has long been the rule of our Circuit that when a complaint relies on indisputably authentic documents and public records, examination of those documents and records is proper when considering a motion to dismiss. *See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993); *see also Sands v. McCormick*, 502 F.3d 263, 268 (3d Cir. 2007) (noting that "judicial proceedings constitute public records"). Thus, to the extent that consideration of the Buyback Motion, a public record quoted in the Complaint, entered at all into the Bankruptcy Court's decision to dismiss the Complaint, there was no error.

Finally, Intertek asserts that the Bankruptcy Court's interpretation of the Plan and Buyback Order constitutes an impermissible release of tort claimants' interests in the Chartis Proceeds because the release is not clear and the tort claimants did not vote in favor of the Plan or receive full payment on their claims; that the Bankruptcy Court's interpretation of the Buyback Order and Plan violates § 1141 of the Bankruptcy Code because the Plan seeks liquidation rather than reorganization; and, that the Buyback Order and Plan effectuate an improper discharge of Intertek's interests in the Chartis Proceeds because its claim for indemnification and contribution arose post-petition. We decline to address the substance of these arguments because they were not raised before both the Bankruptcy Court and the District Court, and therefore are waived. *See In re*

15

*Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 261-62 (3d Cir. 2009); *Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV*, 229 F.3d 245, 253 (3d Cir. 2000); *In re Trans World Airlines, Inc.*, 145 F.3d 124, 131-33 (3d Cir. 1998).

\* \* \* \* \*

We conclude that the bankruptcy documents at issue are unambiguous and were effectuated according to their plain meaning. We therefore affirm the judgment of the District Court.